# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============
## NO. 03-00-00097-CV
===============

**Simplified Telesys, Inc., Appellant**

**v.**

**Live Oak Telecom, L.L.C.; David Womack; Dan Hardy; Khan Ryder Lewis; and Dale Dornfeld, Appellees**

=================================================================
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. 98-13809, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING
=================================================================

Simplified Telesys, Inc. ("Simplified") appeals from a no-evidence summary judgment recovered by Live Oak Telecom, L.L.C. ("Live Oak"), David Womack, Dan Hardy, Khan Ryder Lewis, and Dale Dornfeld. (We will refer to appellees hereafter by surname or as "appellees.") The judgment orders that Simplified take nothing by its suit against appellees. We will reverse the judgment and remand the cause to the trial court.

### THE CONTROVERSY

At some expense, Simplified developed by research, trial, and error, and now sells profitably, a computer program, said to be unique, that initiates the detailed instructions necessary to operate any of three switches used in accounting for certain prepaid telephone

calls.[1] While working for Simplified, Womack, Lewis, and Dornfeld worked on parts of the ten separate steps necessary to develop the program. None was permitted, however, to work on or become familiar with all ten steps—a measure employed by Simplified to assure the confidentiality of its "method" of development. Their *combined* knowledge encompasses, nevertheless, nine of the ten steps, or the "know how" necessary to duplicate Simplified's computer program. As a condition of their employment at Simplified, Womack, Lewis, and Dornfeld signed written agreements not to use any "Confidential Information of the Company," save for Simplified's benefit.

In its petition in the present cause, Simplified alleged that Womack and Hardy organized Live Oak, a corporate entity, while Womack was employed by Simplified; they persuaded Dornfeld and Lewis to leave Simplified with Womack to work for Live Oak; and these actions were taken for the express purpose of developing a computer program to compete with Simplified's program used in connection with prepaid telephone calls. To restrain appellees' conduct, alleged to be a breach of the written confidentiality agreements, Simplified prayed for temporary and permanent injunctive relief. Appellees appeared and answered by a general denial.

A series of agreed temporary restraining orders preserved the status quo pending a hearing on Simplified's application for temporary injunction. After an evidentiary hearing on

---

[1] A "program" in this context refers to a "[s]chedule of actions to be followed for solving a problem" or a "series of instructions that a machine system can follow." *Sv.*, *Information Processing, 12 Encyclopedia Britannica* 246 (1973). Described otherwise, a "program" is "a series of coded instructions that can be inserted in a mechanism (as a computer)." *Sv.* "program," *Webster's Third New International Dictionary* 1812 (1986).

June 15, 1999, Judge Joseph H. Hart signed a temporary injunction order restraining appellees *pendente lite* "from using or disclosing any confidential proprietary information, confidential technical data or trade secrets" belonging to Simplified, these terms being defined in the order to include work on a computer program used with prepaid telephone calls.

After adequate time for discovery, appellees moved for summary judgment on the ground that there existed no evidence of any of the elements of the cause of action alleged by Simplified. *See* Tex. R. Civ. P. 166a(i). Appellees identified the cause of action as Simplified's "cause of action for misappropriation of trade secrets and confidential proprietary information." Appellees identified the elements as (1) "the existence of a trade secret," (2) "the trade secret was disclosed to another person in confidence," and (3) "the other person used the secret without authorization."[2]

Rule 166a(i) required that appellees' motion for summary judgment be granted unless Simplified "produce[d] summary-judgment evidence raising a genuine issue of material fact." *Id.* In that connection, we note that a comment accompanying Rule 166a(i) required that Simplified "point out evidence that raises a fact issue on the challenged elements." *Id.*, notes and cmts.

In its response to appellees' no-evidence motion for summary judgment, Simplified stated that "[t]he evidence sufficient to raise a genuine issue of material fact is all

---

[2] As the case developed, the parties basically disputed only the first element—"the existence of a trade secret," without which there could be no disclosure to or use by another person. For reasons given hereafter, we believe the existence of a trade secret is *not* a controlling issue.

3

contained in the Reporter's Record" of evidence given at the temporary injunction hearing. A transcript of such evidence was attached as Exhibit A to Simplified's response.

Judge Margaret Cooper heard appellees' no-evidence motion for summary judgment on September 20, 1999, and signed on November 5, 1999, a final summary judgment that Simplified take nothing by its actions. Simplified appeals on the issue of whether the trial court erred in granting the summary judgment. *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970).

## THE SUMMARY-JUDGMENT RECORD

Before considering whether Simplified produced summary-judgment evidence sufficient to raise a genuine issue of material fact on its claim for breach of the confidentiality agreements, we must determine what evidence is properly included in the summary-judgment record.

The Reporter's Record compiled at the hearing on temporary injunction consists of 205 pages recording the testimony of James Cashiola, Womack, Eugene Thomas Oden, and Lewis. Appellees contend we may not consider the entirety of the Reporter's Record in judging whether it shows a genuine issue of material fact precluding summary judgment. Appellees argue particularly that we may not consider Cashiola's testimony, set forth in the Reporter's Record, because Simplified did not sufficiently specify or "point out" his testimony in Simplified's response to appellees' no-evidence motion for summary judgment. Rather, Simplified first "pointed out" his testimony *in a brief* filed *after* the summary-judgment hearing. This was too late for the trial court to consider Cashiola's testimony, appellees argue, because

4

the brief was filed outside the seven days allowed by Rule 166a(c). *See* Tex. R. Civ. P. 166a(i), notes and cmts.

We take a different view of the matter. Appellees' argument depends on the silent, but in our view false, premise that the entirety of Simplified's Exhibit A, attached to and referenced in Simplified's timely filed response, was not part of the summary-judgment record.

"Rule 166a(c) plainly includes in the record evidence attached either to the motion or to a response"; thus, the Reporter's Record in its entirety was "proper summary-judgment evidence on which both movant and the [non-movant] could rely." *Wilson v. Burford*, 904 S.W.2d 628, 629 (Tex. 1995). By referring to the attached Exhibit A in Simplified's timely filed response, Simplified "produce[d] summary-judgment evidence" as required by Rule 166a(i) and "point[ed] out evidence" as required by the accompanying notes and comments. *See Barraza v. Eureka Co.*, 25 S.W.3d 225, 228-30 (Tex. App.—El Paso 2000, pet. denied). We find nothing in the rules to suggest that the non-movant's response must designate the page numbers of a transcription of testimony or the names of the witnesses giving such testimony. *Cf.* Tex. R. App. P. 38(f), (h). If an attachment to the response contains the testimony of several witnesses or an aggregate of other discrete pieces of evidence in a form that denies fair notice, the movant is free to file and serve within three days before the hearing any exceptions or objections he wishes to levy against the non-movant's response. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 175 (Tex. 1995); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 n.7 (Tex. 1993). And the trial court, if it feels unduly burdened, may in its discretion order the non-movant to amend its response by furnishing more particular references. No such order or

5

exceptions were filed in the present cause. In all events, we cannot say a 250-page Reporter's Record is unduly burdensome, as a matter of law, especially when nothing in the present record reveals the *trial court* declined to consider or excluded from the summary-judgment record any part of the evidence recorded in Exhibit A. *Cf. Guthrie v. Suiter*, 934 S.W.2d 820, 825-26 (Tex. App.—Houston [1st Dist.] 1996, no writ).

We therefore overrule appellees' apparent contention that *we* are forbidden, as a matter of law, to consider the entirety of the Reporter's Record attached as Exhibit A to Simplified's timely filed response. We will now review the summary-judgment evidence, viewing it in a light most favorable to Simplified, to ascertain whether it furnishes more than a scintilla of evidence so as to raise a genuine issue of material fact on the issue of whether Womack, Lewis, and Dornfeld breached their confidentiality covenants. *See* Tex. R. Civ. P. 166a(i); *Whalen v. Condominium Consulting & Mgmt. Servs., Inc.*, 13 S.W.3d 444, 446 (Tex. App.—Corpus Christi 2000, pet. denied).

### SUFFICIENCY OF THE SUMMARY-JUDGMENT EVIDENCE

We are required to apply the legal rules applicable to confidentiality covenants and the requirements of Rule 166a(i) in the equitable context of Simplified's suit for injunctive relief. In such cases

> [t]he main guiding principle is the prevention of an unfair or unjust result. Thus, the court in an equitable action must often take into consideration a myriad of circumstances and factors that would be immaterial in a legal action. This places an extraordinary burden on litigants in attempting to show and courts in purporting to conclude that there is no genuine issue of material fact.

6

1 McDonald Texas Civil Practice § 18.2, at 458 (1992); *accord Johnson v. Cherry*, 726 S.W.2d 4, 8 (Tex. 1987).

The starting point is, we believe, the undisputed fact that Womack, Lewis, and Dornfeld, while employed by Simplified, learned information that *allegedly* comes within the written confidentiality agreements they executed. "The first thing to be made sure of is that [they] shall not fraudulently abuse the trust reposed in" them by their covenants and their employment at Simplified. *Du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917); *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 770 (Tex. 1958).

The confidentiality agreements provide that Womack, Lewis, and Dornfeld will "hold in strictest confidence, and not use," during the term of their employment at Simplified "and thereafter, . . . any Confidential Information of the Company," *except for Simplified's benefit*. Each of them acknowledged

> that Confidential Information means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists, and customers . . . , markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information . . . or other business information disclosed to me by the Company either directly or indirectly in writing, orally, or by drawings or observation of parts or equipment. I further understand that Confidential Information does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

The confidentiality covenant includes more than "trade secrets." It embraces any "proprietary information, technical data," and "know-how, including, but not limited to" the designated

items.  The supreme court has stated that injunctive relief awarded in cases such as this is intended to protect more than the secrecy of information; such relief is also intended to protect against violence to the confidential relationship and the covenants governing the acquisition of confidential information.  *See Huffines*, 314 S.W.2d at 770.  "Whether the plaintiffs have any valuable secret or not[,] the defendant knows the facts, whatever they are, through a special confidence that he accepted"; and while a trade-secret status may be denied, "the confidence cannot be."  *Id.*; *accord Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 601 (Tex. App.—Amarillo 1995, no writ

As a basis for its suit for injunctive relief, Simplified alleged "Defendants Womack, Dornfeld, and Lewis are in clear, open, and defiant breach of the Confidentiality Agreement [and] the other Defendants are in complicity with [them] in said breach."  The ptition incorporated attached copies of the Confidentiality Agreements executed by Womack, Dornfeld, and Lewis.

Against this claim, appellees' no-evidence motion for summary judgment averred that Simplified, "[i]n order to establish a cause of action for misappropriation of trade secret *and* confidential proprietary information," had the burden of proving "the existence of a trade secret."  (emphasis added.)  This was an incorrect formulation of Simplified's burden.  Its burden was to provide more than a scintilla of evidence showing a breach of the confidentiality agreements by misappropriation of a "trade secret" *or* the use of any *other* information coming

8

within the prohibition contained in the agreements signed by Womack, Lewis, and Dornfeld, whether that information amounted to a "trade secret" or not.[3]

Arguing from their incorrect formulation of Simplified's summary-judgment burden, appellees argue that the summary-judgment evidence does not show the first element of a cause of action for the misappropriation of a "trade secret"—the *existence* of a trade secret susceptible of misappropriation. And, appellees argue, a fact issue is not raised as to this element because nothing in the summary-judgment evidence describes the *technical details* of Simplified's claimed "method" for developing computer programs of the kind in dispute. Simplified argues that such evidence is found in testimony showing the various measures it took to assure and maintain the secrecy of its method, contending these measures have probative force establishing the trade-secret status of its "method," even though the technical details of that "method" are not found in the record save in the broadest or most general terms. *See generally T-N-T Motorsports, Inc. v. Hennesey Motorsports, Inc.*, 965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, mandamus dism'd); Alois Valerian Gross, *What Is a "Trade Secret" so as to Render Actionable Under State Law Its Use or Disclosure by Former Employee*, 59 A.L.R.4th 641 (2000). Because the written confidentiality agreements prohibit unauthorized use of any kind of

---

[3]   Whether the movant is entitled to judgment as a matter of law, because of the absence of any genuine issue of material fact, must be determined in light of the parties' *pleadings* as well as the motion for summary judgment, any response thereto, and the balance of the summary-judgment record. Tex. R. Civ. P. 166a(c). We find in the record no basis for appellees' subdividing the confidentiality agreements, isolating the trade-secret element, and obtaining judgment *on that element alone*. Appellees moved for and obtained summary judgment on the whole case. Consequently, their entitlement to such judgment must be judged against Simplified's pleaded cause of action based on the whole of the confidentiality covenants.

"Confidential Information" belonging to Simplified, whether entitled to trade-secret status or not, we believe it unnecessary to discuss the foregoing aspects of the parties' contentions. We turn then to the questions of whether a breach of the Confidentiality Agreements is shown by more than a scintilla of evidence, precluding summary judgment against Simplified's pleaded cause of action.

James Cashiola testified he was president, chief executive officer, and majority shareholder of Simplified. The method employed by Simplified to create computer programs used for prepaid telephone cards constitutes information that gives Simplified an advantage over competitors who do not use the same kind of method. While the results produced by that program are not necessarily unique or novel, the way the program accomplishes the required operations "is specific to Simplified." Simplified invested $3,000,000 to $4,000,000 developing its method of creating the program and that method is not generally known. Simplified has kept its method secret by requiring all employees to sign confidentiality agreements and by not allowing any particular individual to learn how to prepare the entire program. Simplified sells its resulting "software" in a "package that includes the computer program." The smallest system it has sold "is somewhere in excess of [$]750,000." When asked whether it took some time to develop Simplified's programs, Cashiola answered:

> It's taken an enormity of time and an enormity of investment and an enormity of effort, especially the way in which Simplified will only hire people who do not have any telecommunications experience.
>
> So for us to take somebody and really just teach them the language, our own special language of telephones in that world and communications in general, is a long and very expensive process, so it really takes us months to get somebody

10

up to speed where we can actually get some solid productivity out of them. But we do that to protect the ideas, our specific method of which—the way in which we do things, which is unique to the industry.

* * *

The way in which we—the way in which we approach the entire system; in other words, when a customer comes and says, "I want to do a '—' I want to buy software and a system that accomplishes a telephone call, and regardless if that's just you want to talk to somebody, you want to leave a message for someone, you want to—if you're a customer who sells cards, if you're a customer that sells prepaid services, whether that be prepaid cards or prepaid telephones or prepaid local—those are really just billing treatments—but there are different approaches to that.

And where Simplified is unique, and it's obvious in our latest patent filing, is that we have a certain way that really moves beyond what the normal limitations were, which is why our package is getting very popular, and that is, we have a method that says, "If you do it our way and buy our package, you can now grow more economically past the common ceilings of processing and number of phone calls that were done prior. And that is unique to us, and we enjoy the largest—the largest system that is commercially available Simplified has in the field. No one is even close to us at this point.

[T]he way in which we develop software is a team approach and really it's a collective work is what our total package is. [Lewis and Dornfeld] were able to see bits and pieces and components and see the way in which we—the overall method in which we're trying to accomplish this task.

Lewis testified as follows: He is presently Live Oak's Vice President for Program Development. He accepted employment at Live Oak immediately after leaving Simplified. Before going to work for Simplified, neither he nor Dornfeld had any experience or background in writing computer programs for application in the telecommunications field. While he had some experience writing simple programs before his employment at Simplified, the work there was more sophisticated and involved a "learning curve" on his part. He "came out of Simplified with far more knowledge about how to program telecommunication software than [he] had

11

before [he] went to work there." Consequently, his work at Live Oak developing a competing program can be accomplished in much less time. Lewis responded as indicated to the following questions:

Q. Isn't it true that in the process of working at Simplified, you gained know-how in the telecommunications industry that you're now using at Live Oak?

A. That's correct.

* * *

Q. Isn't it true that the things you learned at Simplified that you're using at Live Oak include programming [and] programming language C?

A. Yea.

Q. And you learned [at Simplified] the basic call flow, how a calling card works per se, . . . .

A. To the end user of the calling card, yes.

Q. You learned the commands that the Summa/4 switch uses at Simplified?

A. Yes.

Q. You learned how to send those commands and receive those commands from a Summa/4 switch at Simplified?

* * *

A. Yes.

* * *

Q. And you're using all of those things that we just walked through in your programming [at Live Oak], correct?

A. That's correct.

* * *

12

Q. With the exception of [step] No. 4, could you write program code for the rest of those numbers on there that you said you don't know how to write right now?

A. Yes.

\* \* \*

Q. If you could, why aren't you writing the code for those others at Live Oak?

A. We've divided up the work amongst the employees, and I was chosen to do (steps 1, 6, 7, and 9 out of the ten required for the program).

Q. And you've divided it up as between you and Mr. Dornfeld based upon your prior knowledge of how to write the code that you learned at Simplified for those—the steps you outlined for you and those for him; that's true, isn't it?

A. Yes.

Womack conceded in his testimony that Lewis and Dornfeld were using information they learned at Simplified in developing Live Oak's competing program.

Eugene Thomas Oden testified as follows: He came to work for Simplified about the same time as Womack. At that time, Oden had no experience as a computer programer. Before leaving Simplified, Womack solicited Oden to come to work for the newly formed Live Oak "[t]o do basically what we had done at Simplified." Womack said "[s]omething about 'Now that we've finished'—or 'now that we've done it, the second time would be easier,' or something like that." Oden responded as follows to the questions indicated:

Q. Counsel asked you about general information, you said you had gotten general information from this switch manual [published by the manufacturer of one of the three switches operated by Simplified's program]. Did you get any specific information on how to write programs to accomplish these [ten] steps in Exhibit 4 at—from personnel at Simplified?

13

A. I'm sorry, I was thinking about—

Q. Yes. Sir. Did you get any—look at the exhibit—that Exhibit 4 you got in your lap, the first page of it has ten steps that a prepaid—or card phone call goes through, as I understand it. Okay. You with me?

A. Yes.

Q. Were you given specific information while at Simplified from Simplified personnel as to how to write a program that would accomplish those steps?

A. Yes.

Q. Now, is the way in which a program is written . . . at Simplified to accomplish those steps something that is not widely known or not known outside of Simplified other than possibly in the heads of Mr. Dornfeld or Mr. Lewis?

A. Well, as I said, I don't know how everyone does it in the industry, but what we've done at Simplified is based on several years of experience from James Cashiola.

We conclude the foregoing amounts to more than a scintilla of evidence that Simplified's "method" is not "publicly known" and "generally available" information and that Womack, Lewis, and Dornfeld are using "know-how," "research," "processes," "formulas," "technology," or "designs" in violation of their covenants not to use such "Confidential Information" except for Simplified's benefit. *Cf. Electronic Data Sys. Corp. v. Powell*, 524 S.W.2d 383 (Tex. Civ. App.—Dallas 1975, writ ref'd n.r.e.).

We are not to be understood as holding that the evidence summarized above is sufficient to frame a permanent injunction order should one be necessary following trial. Nor do we purport to delineate finally and categorically between what constitutes "Confidential Information," on the one hand, and on the other hand "publically known" information within

14

the meaning of the confidentiality covenants. We hold only that the evidence summarized in our opinion is sufficient to avoid the summary judgment ordered by the trial court because such evidence raises a genuine issue of material fact as to whether Womack, Lewis, and Dornfeld breached those covenants.

For the reasons given, we reverse the trial-court judgment and remand the cause to that court.

_____

John E. Powers, Justice

Before Justices Kidd, Yeakel and Powers[*]

Reversed and Remanded

Filed: December 21, 2000

Do Not Publish

---

[*] Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).