MABREY V. SANDSTREAM

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-02-351-CV

JIM MABREY APPELLANT

V.

SANDSTREAM, INC. APPELLEE

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  INTRODUCTION

Appellant Jim Mabrey (“Mabrey”) appeals from an order granting Appellee SandStream, Inc. (“SandStream”) a temporary injunction prohibiting Mabrey from, among other enumerated acts, ”mak[ing] any commercial, business, or personal use” of SandStream’s confidential, trade secret, and proprietary information.  In three issues, Mabrey complains that the trial court abused its discretion by granting the temporary injunction because SandStream presented no evidence of a probable right to relief on its claims against Mabrey;  SandStream presented no evidence of a probable, imminent, and irreparable injury pending trial on the merits; and the temporary injunction is overbroad and vague in violation of Texas Rule of Civil Procedure 683.  We will affirm.

II.  THE CONTROVERSY

SandStream’s goal was to design the first “converged” architecture for delivering television, telephone, internet, movies, and games, integrated into one service delivered to residences through one physical medium,  fiber optic networks, using an internet protocol (“IP”).  SandStream’s CEO, Patrick Robbins, together with another individual and Tom Wendt, a computer scientist with extensive experience in technology and business models for internet services, formed the company in September 1998.   

Robbins raised investments of over forty million dollars from friends, relatives, vendors of equipment such as Cisco Systems and Nortel, and other individual investors.  With those funds, SandStream’s team of engineers worked for four years researching, designing, and developing technology for its multicast network operations center in Lewisville, Texas.  This technology included digital IP set-top-box hardware and software, a conditional access system, an end-to-end network for IP digital packet television, high-speed internet data and voice, and integration of off-the-shelf equipment.  The team also obtained content agreements with numerous cable companies, movie companies, and television networks.

Mabrey, a developer of planned residential communities, contacted SandStream in January 2002 to explore using SandStream’s proposed converged services for homes in a subdivision he was developing in Denton County.  SandStream presented Mabrey with a product demonstration at its facility in Lewisville.  Mabrey hired engineering consultants who conducted technological and business due diligence investigations of SandStream.  However, SandStream first required a nondisclosure and confidentiality agreement from Mabrey’s company, Residential Broadband Services, Inc. (“RBS”).  Mabrey signed that agreement on February 1, 2002.   

Mabrey initially invested $120,010 in SandStream on March 21, 2002, in return for stock.  He furnished “bridge” financing in April 2002 in the form of a loan of an additional $600,000, taking a senior secured position to Cisco’s lien of eighteen million dollars for equipment it had sold SandStream.  Ultimately, however,  Mabrey did not contract with SandStream for services for his proposed residential development.

Irving Napert, an independent consultant for Sundance Square Development, was searching for telecommunications services for the Sundance Square 40-block entertainment and residential development in downtown Fort Worth.  During the same time that Mabrey was working with SandStream, Napert approached SandStream to see if its technology would be suitable for Sundance Square.  Napert attended a meeting and tour of SandStream’s operations facility in January 2002.  SandStream presented a proposal and business model to Napert.   

Napert signed a nondisclosure agreement with SandStream on January 24, 2002, had subsequent meetings with SandStream representatives, and reviewed additional business models provided by SandStream.  Ultimately, Napert was permitted to see all of SandStream’s backup financial information supporting its business plan.  However, Sundance Square’s management did not enter into an agreement for SandStream’s service. 

SandStream had been in financial difficulty since the end of 2001.  By March 2002, SandStream had missed at least two payrolls to all of its employees.  On May 24, 2002, in default on its loan from Cisco and unable to meet its May payroll, SandStream laid off all but nine of fifty-two employees. SandStream is still attempting to raise capital but retains only four unpaid employees now with no engineers, and the company remains several months away from deployment of its service. 

On August 22, 2002, SandStream sued Mabrey, Napert, a number of former employees of SandStream, and Fiber.TV, a new company formed by Napert and two of the former SandStream engineers in June and July 2002.  SandStream alleged that the individual defendants formed and intended to operate Fiber.TV as a direct competitor of SandStream, with the sole purpose of improperly using SandStream’s “technology, unique industry relationships, business practices, and financial and business models for Defendants’ financial gain.”  SandStream alleged causes of action against the defendants for breach of contract, tortious interference with contract, misappropriation of trade secrets, conversion, breach of fiduciary duties, and, as to Mabrey, aiding in the breach of fiduciary duties by the other defendants.  SandStream sought damages, a temporary restraining order (“TRO”), and temporary and permanent injunctive relief.
(footnote: 1) 

The trial court issued a TRO against all defendants and, after hearing evidence on SandStream’s application for a temporary injunction over a period between September 9 and 26, 2002, the trial court granted SandStream a temporary injunction against most of the defendants, including Mabrey.  Mabrey filed a notice of accelerated appeal.
(footnote: 2)
III.  STANDARD OF REVIEW

The sole issue before the trial court in a temporary injunction hearing is whether the applicant may preserve the status quo of the litigation’s subject matter pending trial on the merits.
(footnote: 3)  An applicant must plead and prove three elements to obtain a temporary injunction:  (1) a cause of action against the defendant; (2) a probable right to the relief; and (3) a probable, imminent, and irreparable injury in the interim.
(footnote: 4)
 The applicant for a temporary injunction is not required to establish that he or she will prevail upon a final trial.
(footnote: 5)  The merits of the applicant’s suit are not presented for review.
(footnote: 6)  Our review is strictly limited to whether the trial court clearly abused its discretion in granting the temporary injunction.
(footnote: 7)  We may not substitute our judgment for that of the trial court by vacating or modifying an injunction simply because we would have decided otherwise.
(footnote: 8)  An abuse of discretion does not occur as long as there is some evidence to support the trial court’s decision.
(footnote: 9)  Furthermore, an abuse of discretion does not exist where the trial court bases its decision on conflicting evidence.
(footnote: 10)  As the reviewing court, we must draw all legitimate inferences from the evidence in a manner most favorable to the trial court’s order granting a temporary injunction.
(footnote: 11)  Finally, we note that, where findings of fact are not requested or separately filed as in this case, the order of the trial court must be upheld on any legal theory supported by the record.
(footnote: 12)
IV.  TRADE SECRET, PROPRIETARY, AND CONFIDENTIAL INFORMATION

Because SandStream’s causes of action, as well as the order granting the temporary injunction, are based upon alleged improper disclosure and use of trade secrets and proprietary and confidential information, we look to the well-developed body of Texas law on that subject.

A.  Applicable Law

 In two landmark companion cases, the Supreme Court of Texas long ago defined the rights of owners of trade secrets and proprietary and confidential information.
(footnote: 13)   Trade secrets are in the nature of property rights that the law protects through both tort and contract principles.
(footnote: 14)  “A trade secret may be a device or process which is patentable; but it need not be that. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement . . . .”
(footnote: 15)  A person is liable for disclosure or use of trade secrets if he either (a) discovers the secret by improper means or (b) his disclosure or use, after properly acquiring knowledge of the secret, constitutes a breach of a confidence reposed in him.
(footnote: 16) 

To determine whether a trade secret exists, we apply the test from section 757 of the Restatement of Torts, which lists six factors the supreme court has recently held are relevant but not exclusive criteria:

(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
(footnote: 17)

B.  Injunctive Relief for Trade Secret Protection

It is well-settled that, in addition to damages, injunctive relief may be granted to the owner of a trade secret.
(footnote: 18)  Injunctive relief in cases of this type is intended to protect more than just secrecy but also to protect against violence to the confidential relationship governing the acquisition of confidential information.
(footnote: 19)  Importantly, in determining whether to grant a trade secret protection by a temporary injunction, a trial court does not determine whether the information sought to be protected is, in fact and in law, a trade secret.
(footnote: 20)  Rather, the trial court determines only whether the applicant has established that the information is entitled to trade secret protection until the trial on the merits.
(footnote: 21)
 V.  THE EVIDENCE

SandStream offered evidence at the temporary injunction hearing that its technology and business models developed through the work of its team of engineers since 1998 constituted trade secrets and proprietary and confidential  information.  Robbins, SandStream’s CEO, testified to efforts the company took to keep that information secret.  He testified that the company had applied for a “system and method” patent covering the solutions its engineers had found through trial and error for delivery of voice, video, and data on a digital network, as well as its method of entry of content, recovery from failures, communication with other networks, packaging, the process of delivery with encryption technology, technology for presenting video, and method of communication with the set-top-box. 

Robbins further testified that, to protect its research and trade secrets, SandStream required nondisclosure agreements from all persons interviewed and hired, all vendors, and all potential investors.  SandStream’s physical security included industry standard mechanisms such as locks, badge readers, cameras, equipment cages, and fenced-in vital infrastructure.  SandStream used “secure servers,” networks with firewalls, access lists for computers, and coded card keys for access based on job function of employees.  It issued mandatory instructions for clearing cubicles and putting away sensitive information prior to tours of the facility by visitors and kept visitors out of restricted areas. 

Mabrey received a fifty-three page due diligence report from his consultants on March 19, 2002, summarizing the information disclosed by SandStream for their review.  Robbins and other current officers as well as former SandStream engineers testified extensively at the temporary injunction hearing that the information SandStream had disclosed to Mabrey’s consultants was trade secret, proprietary, and confidential information.  According to that testimony, Mabrey’s consultants worked for weeks in labs at SandStream, observing the results of tests, and conducting business audits.  Many SandStream employees worked full time on the investigation, assisting Mabrey’s consultants.  SandStream provided full access to its technology and employees to Mabrey.  The final due diligence report for Mabrey, Robbins said, was a fair representation of the state of SandStream’s technology, proprietary information, trade secrets, and innovations as of March 2002. 

Russ Ramsland, SandStream’s Vice President of Finance, testified that he was involved with the negotiation and potential transactions with Mabrey.  He testified that he allowed Mabrey’s consultants to come in and review SandStream’s business plan and that the plan was confidential and was developed specifically by SandStream’s engineers and executives.  Ramsland also testified that, upon review, the details of the plan with Mabrey’s consultants included providing at least twenty-five business models and took weeks of work, consuming virtually all of his team’s time and all of the lab and deployment teams’ time. 

Allen Easty, chief scientist for SandStream, was in charge of intellectual property for the company, gathering ideas and patents, and bringing in other companies as partners.  Tom Wendt, as one of the original founders of SandStream, was Vice President of Technology and was responsible for strategies in raising money.  Easty and Wendt, aware of SandStream’s financial bind, had discussions about forming Fiber.TV possibly as early as April 2002, even before the employees were laid off in May.  Wendt registered the domain name of “Fiber.TV” on May 24, 2002, the day they were laid off.  Some of the laid-off engineers met several times at his house and discussed what and how they would build a converged system, “rethinking” the product and services, and developing a business plan for a new company.  The new company, Fiber.TV, was incorporated in July, with Napert, Easty, and Wendt as the incorporators.  Napert agreed to be the CEO. 

Robbins testified that Mabrey knew SandStream was running out of money.  According to Robbins and Ramsland, Mabrey made verbal promises and assurances from February through May 2002 to SandStream for funding of fifteen to twenty million dollars in addition to his earlier investment and loans.  However, SandStream received no additional funding from Mabrey. 

 Mabrey does not dispute that, on or about July 18, 2002, he invested $30,000 in Fiber.TV.  Napert and Wendt testified that Mabrey arranged for additional funds of $35,000 for Fiber.TV as a loan.  Former SandStream engineers were paid fees out of those funds for work they did for Fiber.TV as “consultants.”
(footnote: 22)  Napert and Wendt testified that the amounts provided by Mabrey to Fiber.TV were part of a total of $500,000 that Mabrey agreed to obtain for Fiber.TV by a written agreement.
(footnote: 23)
 On July 26, 2002, SandStream’s CEO received a copy of an investment “flier” for Fiber.TV, faxed to him by a potential SandStream investor.  The flier announced, among other claims, that: “Fiber.TV is the entertainment and communications content service provider for Fiber-to-The-Home (FTTH) and it is the company that solved the complex issues” involving fiber-to-the-home. The overview further stated that the “founders” of Fiber.TV had developed digital packet television, “true IP video television distribution with converged telecommunications and internet services.”  Robbins testified that those claims represented, instead, what SandStream, itself, had accomplished over four years, and the strategies of Fiber.TV were “identical” to those of SandStream. Robbins further testified that the term “Fiber.TV” was a term first developed and used at SandStream.  He testified that the representations and claims made in the overview of Fiber.TV on its website were “all” identical to SandStream’s accomplishments and strategies, which took SandStream four years and forty million dollars to develop, whereas Fiber.TV was formed a little over a month before it published its claims on the website.  Mabrey did not testify at the hearing on the temporary injunction, but there was also testimony from other defendants themselves that Wendt was “pitching” Fiber.TV as simply deploying what had been developed at SandStream.  Their testimony was undisputed that the Fiber.TV facility or office had no lab, no satellite dishes, and no rooms for engineering or testing.  Easty admitted the strategy of the two companies was the same.  He also admitted he took confidential and proprietary information with him when he left SandStream.  Wendt admitted that, at Fiber.TV, his decisions will include all he learned at SandStream over four years. 

Napert testified that he authored the investment “flier,” and acknowledged that the flier’s representation that Fiber.TV was the “leader” in IP communications inferred that Fiber.TV had a competitive edge in the marketplace.  Both companies were competing for the same customers, and both were pursuing the same companies as “business opportunities.”  The Fiber.TV “team” referred to in the flier consisted of SandStream’s former engineers.  Fiber.TV could not have negotiated agreements, as it claimed, with networks such as ABC, CBS, FOX, ESPN, Disney, and ShowTime in two months, when it took two years for SandStream to negotiate such contracts. Fiber.TV had no “pending patents” in hand, contrary to its representations; that claim was a “lie.”  The only pending patent the defendants had was SandStream’s, not Fiber.TV’s, as the flier asserted. 

Napert further admitted that the statement in the flier that no entity other than Fiber.TV has a true digital packet distribution system was “absolutely false.”  The strategy of Fiber.TV to provide the “end-to-end solution” was exactly the same as SandStream’s.  There was testimony that Fiber.TV had not done any of the things stated on the flier that it had claimed.  SandStream filed this suit shortly after Robbins obtained the copy of the Fiber.TV investment flier.

VI
.  
PROBABLE RIGHT TO RELIEF

A.  Breach of Contract

Mabrey first contends the trial court abused its discretion by granting the temporary injunction against him because SandStream presented no evidence of a probable right to relief on its alleged cause of action for breach of his nondisclosure agreement.  Mabrey does not argue that the information disclosed to him through his due diligence does not constitute trade secrets or confidential information.  Indeed, the testimony was undisputed that the information furnished to Mabrey represented SandStream’s technology and constituted trade secrets and proprietary and confidential information.
(footnote: 24)  Instead, Mabrey argues that the trial court abused its discretion in finding that SandStream established a probable right to relief based on its breach of contract claim by misapplying the law to the terms of his nondisclosure agreement.  He contends that the terms of that agreement allowed him to invest in Fiber.TV because they expressly permitted him to enter into transactions “similar to” the investment agreement that he and SandStream had contemplated in entering into the nondisclosure agreement.

Mabrey’s letter agreement, with SandStream, entitled “Confidentiality—Due Diligence,” provided that each party would provide certain “Evaluation Material,” for the exclusive purpose of analyzing the parties’ proposed transactions.  The provision Mabrey relies upon states that each party acknowledges and agrees that each party “may . . . (i) refrain, for any reason, from entering into any transaction proposed by the other party; or (ii) negotiate or enter into transactions 
similar to or in lieu of
 the Proposed Transaction.”  [Emphasis added.]
(footnote: 25)  

While we agree that Mabrey was not precluded in the agreement from simply investing in another company with a competing product or service, we disagree with Mabrey’s argument that the terms of the nondisclosure agreement permitted Mabrey to decide to invest in Fiber.TV.  We decline Mabrey’s invitation to hold that the nondisclosure agreement allowing “similar transactions” may be interpreted under the evidence presented in this case to allow Mabrey to use SandStream’s trade secrets, proprietary, and confidential information acquired by Mabrey pursuant to his nondisclosure agreement with SandStream, to decide to invest in a company that intended to use SandStream’s secret information to produce and market the identical product.  Moreover, Mabrey overlooks the nondisclosure agreement’s additional provision that the Evaluation Material would be reviewed and used by Mabrey for the
 
“exclusive” purpose of analyzing his proposed investment with SandStream, “and not for any other purpose (including 
any use 
which could reasonably result in a competitive disadvantage to the disclosing party [SandStream]).” [Emphasis added.] 

In interpreting contract language, we ascertain the true intentions of the parties as expressed in the entire contract in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless.
(footnote: 26)  To interpret the nondisclosure agreement as argued by Mabrey, under the pleadings and evidence in the record, as further discussed below, would render meaningless the condition prohibiting “use” of the Evaluation Material furnished to him in a manner that “could reasonably result in a competitive disadvantage” to SandStream.

Mabrey contends that there is no evidence that he “disclosed” SandStream’s trade secrets and, therefore, that there is no evidence that he breached the nondisclosure agreement.  The short answer to his arguments regarding disclosure is that, despite the references by the parties to the letter agreement as a “nondisclosure agreement,” its terms also expressly prohibited “use” of the information furnished to Mabrey in his due diligence investigation of SandStream.

Mabrey argues that there is no evidence of “use” of the confidential information constituting a breach of the nondisclosure agreement because Robbins testified at the hearing that his only basis for contending Mabrey breached the agreement was his belief that Mabrey violated the “spirit” of the agreement by verbally agreeing to be SandStream’s “financier” and, instead, he “funded and helped and assisted a number of engineers to leave the company and start their own company.”  Mabrey characterizes Robbins’s testimony as conclusory and further argues that there is no evidence that he could have assisted any employees to “leave” SandStream because they were laid off before he invested in Fiber.TV.  Rather than looking to Robbins’s personal beliefs, which we agree are purely conclusory, we must review the record under the proper standard, drawing all inferences most favorable to the trial court’s order, to determine whether there is “some evidence” under any theory supported by the record, that Mabrey breached the agreement by use of SandStream’s confidential and proprietary information.
(footnote: 27) 

Mabrey is Fiber.TV’s sole stockholder and sole investor.  It was undisputed that Mabrey had meetings in his home with Napert, Wendt, and Easty to discuss his investment in Fiber.TV.  According to Robbins, Mabrey told him in July 2002 that Wendt and Easty had approached him to raise money and that Napert had explained to him what Fiber.TV was doing.  Robbins testified that Mabrey told him that he had invested in Fiber.TV and that “they were going to do the same thing as SandStream, but cheaper.”  Wendt testified that Mabrey did no “due diligence” before investing in Fiber.TV, other than the meetings at Mabrey’s home, because there was “no need.”  

The trial court could reasonably have inferred that Mabrey had “no need” to conduct a due diligence investigation on Fiber.TV’s proposed technology and business because he already had that same information from his intensive due diligence on SandStream.  While there is conflicting testimony, when the record is viewed under the proper standard, we believe that there is “some evidence” establishing a probability that Mabrey “used” the trade secrets and confidential information he had previously acquired from SandStream through his due diligence investigation of that company as his basis to decide to invest in Fiber.TV, and there is “some evidence” establishing a probability that Mabrey knew Fiber.TV was founded by former SandStream engineers to develop and market the same product, only cheaper, to the competitive disadvantage of SandStream.  Viewing the evidence in the light most favorable to the trial court’s order and indulging every reasonable inference in its favor, we hold that the trial court did not abuse its discretion in determining that SandStream had a probable right to relief against Mabrey based upon breach of contract.

B.  Aiding Other Defendants’ Breach of Fiduciary Duties

Recognizing that the order of the trial court must be upheld based upon any legal theory having support in the evidence, Mabrey addresses the remaining causes of action pleaded by SandStream.  He urges that there is no evidence of a probable right to relief on SandStream’s tort claims for tortious interference of contract, misappropriation of trade secrets, conversion, or knowingly inducing or aiding the other defendants’ alleged breach of fiduciary duties.  Even apart from any written contract, a fiduciary relationship arises from an employment relationship forbidding an employee from using trade secrets or confidential or proprietary information in a manner adverse to the employer.
(footnote: 28)  The obligation survives termination of the employment relationship.
(footnote: 29)  

Even assuming the parties did not intend Mabrey’s nondisclosure agreement to preclude the investment in Fiber.TV, we disagree with Mabrey’s argument that SandStream produced no evidence of a probable right to recovery on its claim of aiding the other defendants in breaching of their fiduciary duties to SandStream.  In
 Elcor Chemical Corp. v. Agri-Sul, Inc
., Miller and Kruse were employees of Elcor, which manufactured a sulfur fertilizer product that they had assisted in developing.
(footnote: 30)  Using their knowledge and experience gained in their employment, they experimented with the formula in Miller’s garage and developed an improved product.
(footnote: 31)  They approached a third employee’s brother-in-law to discuss possible financing and demonstrated the market potential for their “improved” product.
(footnote: 32)  The brother-in-law’s company, Caldwell Computer Company (“Caldwell”) agreed to advance funding in exchange for a controlling interest in a new venture, after its lawyers looked at Miller’s and Kruse’s employment agreements with Elcor and advised that there was “little chance for exposure.”
(footnote: 33)  Thereafter, Miller and Kruse resigned from Elcor and, together with Caldwell, formed a new corporation to produce and market their improved product.
(footnote: 34)  In the suit against them and Caldwell, the trial court found that the information used in making the improved product constituted trade secrets of Elcor, that the former employees disclosed that information to their new company in breach of their employment agreements, and that they had gone into their competing business with the benefit of Caldwell’s aid and encouragement in derogation of their confidential relationships with Elcor.
(footnote: 35) Upholding injunctive relief against Caldwell, as well as the former employees and their company, the court of appeals stated:

The equitable cloak of protection must, of necessity, be full and complete so that those who have acted wrongfully and have breached their fiduciary relationship, 
as well as those who willfully and knowingly have aided them in doing so
, will be effectively denied the benefits and profits flowing from the wrongdoing.
(footnote: 36)
 As previously noted, Mabrey is Fiber.TV’s sole stockholder and sole investor.  While Mabrey, himself, invested only $30,000 in Fiber.TV, there was some evidence that he arranged for an additional $35,000 investment by another group and committed in writing to raise funding of a total of $500,000. There was testimony that Mabrey’s purpose in providing the funding to Fiber.TV was to give the former engineers of SandStream “time to get more money.”  This was some evidence that Mabrey “aided” the other individual defendants in breaching their own fiduciary duties as former employees of SandStream.

There was evidence that Mabrey knew the status of and importance to SandStream of its engineering employees such as Wendt, Easty, and other individual defendants, as well as their possession of valuable trade secret and confidential information, through his due diligence investigation.  His due diligence report stated, in pertinent part, “[I]t is apparent that each member of the SandStream staff contributes the skills and expertise needed to make SandStream successful in each of their areas, respectively.”  Additionally, the report pointed out that the SandStream “technology and business teams have been working together for the last three years to define this technology and this market.  This team is now the only group of experts in this field.  In our opinion, SandStream cannot afford to loose [sic] any of the technical staff working on this project . . . .”  There was also evidence that Mabrey knew former SandStream engineers planned to use their knowledge gained at SandStream to develop and market the same product through Fiber.TV.

We believe the trial court could reasonably conclude from the evidence that SandStream established a probable right to relief against Mabrey in aiding and inducing breaches of fiduciary duty by the former employees of SandStream.  Because we have held that there is some evidence to support a probable right to relief of SandStream on these claims, it is unnecessary to address SandStream’s additional claims of tortious interference with contract, misappropriation of trade secrets, conversion, fraud, or conspiracy as to Mabrey.  We overrule Mabrey’s first issue.

VII.  PROBABLE INJURY IN THE INTERIM

In his second issue, Mabrey asserts that the trial court abused its discretion in granting the temporary injunction against him because SandStream presented no evidence that it faced a probable injury pending trial on the merits. The probable injury element includes three equitable components:  (1) imminent harm; (2) irreparable injury; and (3) the absence of an adequate remedy at law.
(footnote: 37)  
An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief.
(footnote: 38)  
One suffers an irreparable injury if the injured party cannot be 
“adequately compensated in damages or the damages cannot be measured by any certain pecuniary standard.”
(footnote: 39)  A legal remedy may also be inadequate if an award of damages would come too late.
(footnote: 40) 

Mabrey asserts SandStream failed to meet its burden of demonstrating that it faced a probable injury because it offered only generalized, conclusory statements from its CEO, Robbins, that constituted no competent evidence.  Robbins testified that SandStream was in the process of raising money and preparing to take its product to market and that the activities of Fiber.TV impacted SandStream’s potential business partners, investors, and trade relationships.  

When asked what the effect to SandStream of Fiber.TV utilizing the proprietary information and trade secrets of SandStream as if they were property of Fiber.TV and not SandStream, Robbins replied: 

I think certainly the $40 million that our shareholders have invested, if somebody else is allowed to just take that and use it for their own, I think it would have irreparable harm to the value of our company because it would create an enormous competitor in a new industry. 

Robbins also agreed that the effect of competition from a company staffed with former employees of SandStream who had taken trade secrets, proprietary and confidential information would be to eliminate the competitive advantage that SandStream had worked to develop and that the resulting potential harm and damage would not be something that could be compensated by mere monetary damages to SandStream. 

Mabrey also points to Robbins’s testimony during cross-examination, in which the following discussion occurred:

Q. [Defendants’ Counsel]:  Very good.  

I’m not sure we had finished addressing all of the potential relationships that you allege Fiber Television has potentially impeded for SandStream.  In other words, are there any other potential customers, vendors, whatever that Fiber.TV has been in contact with that SandStream also has been in contact with?

A.  Oh, I don’t have any knowledge of what that list would be but certainly all the defendants have been at our company for, some of them, almost four years.  And in that time, there’s probably over 2000 people that came to visit and work with these people.  So I would say that if it was a threat to our intellectual property in our company, there could be an enormous number of customers and companies of relationships that they could impede. 

Q.  You’re just speculating right now, though, right? 

A.  Yes.

Q.  You have no concrete information to that effect, right?

A.  That’s correct.

Q.  So, in fact, SandStream hasn’t lost any revenue, has it, because of activities of Fiber.TV, has it?

A.  I don’t know whether that’s true or not.  We all have potential to get revenue and I don’t know at this time whether we have actually lost any.  I feel as though some of our money raising has been impeded.

Q.  You feel as though it’s been impeded.  What’s your basis for that?

A.  The relationship that I have with the person that had sent me the fax was one that we were going down path of investment.  And that was put off track, I believe, by this.

Q.  And that’s the company called Glow Networks?

A.  That’s correct.

We disagree with Mabrey’s characterization of the testimony and its effect as speculative and incompetent.  Damages are “inadequate” so as to support a temporary injunction if, among other factors, damages are difficult to calculate.
(footnote: 41)  The testimony of SandStream’s CEO constitutes some probative evidence that damages would be difficult if not impossible to calculate to compensate SandStream for any injury in the period pending trial on the merits.

Mabrey argues that SandStream was not a “viable company” that could have been irreparably harmed because it had no customers as of the date of the hearing, had never made any revenue, had no employees drawing a salary, and had only three people showing up at the office regularly.  Temporary injunctive relief may be available, however, to a new business that has not yet entered the market.
(footnote: 42)  An irreparable injury exists when unfair competition deprives the initial producer of the fair opportunity to market its product.
(footnote: 43) 
  Irreparable harm may be established by evidence that disclosure of confidential information could enable competitors to mimic the marketing plans and strategies of the applicant and avoid the less successful strategies, resulting in a “substantial competitive injury.”
(footnote: 44)
 Robbins testified as to the potential for harm to SandStream as a new competitor in a new industry, eliminating within a short time the “competitive advantage” that it had taken SandStream four years to develop.  Ninety percent of the process of development, he said, was in the trial and error of eliminating what did not work.  He described the value of this knowledge as “massive.”  It was the “unique” confidential technology and engineering work that gave SandStream its competitive advantage and that had given SandStream a “head start” in the industry.  Defendants Wendt, Easty, and Pruneau acknowledged in their testimony that the “assets” of Fiber.TV were the combined knowledge of their years of research and trial and error at SandStream.  The “team” referenced in Fiber.TV’s investment flier is SandStream’s engineers.  The “inference” in that flier was that Fiber.TV had the “edge” over competitors in the marketplace and was the leader in IP communications. 

Expanding on his argument that SandStream is not a viable company and, therefore, could not have sustained irreparable injury, Mabrey argues the evidence established that SandStream has received no funding since May 2002 and that it cannot “meet its current debt obligations today.”  However, that an applicant for injunctive relief from improper use of trade secrets has ceased to do business or to use the protected information does not preclude its entitlement to injunctive relief.
(footnote: 45)  Likewise, we must reject Mabrey’s argument that temporary injunctive relief is not warranted because Fiber.TV has not yet entered the market.
(footnote: 46) 

Finally, Mabrey argues that SandStream’s First Amended Original Verified Petition alleges causes of action for damages based on alleged fraud and conspiracy, making clear that SandStream’s true causes of action are for damages, and thereby confirming that SandStream has an adequate remedy at law.  We disagree.  “Simply because the applicant for a temporary injunction asks only for damages as ultimate relief does not guarantee that damages are completely adequate as a remedy. . . . [C]ircumstances can arise in which a temporary injunction is appropriate to preserve the status quo pending an award of damages at trial.”
(footnote: 47)
 We hold that, while there was conflicting evidence, the record viewed in the light of the proper standard establishes some evidence that SandStream would suffer probable injury resulting in irreparable harm pending trial for which damages would constitute an inadequate remedy.  We overrule Mabrey’s second issue.

VIII.  VALIDITY OF ORDER

By Mabrey’s third issue, he complains that the order granting the temporary injunction violates the requirements of Rule 683 by failing to describe in reasonable detail what acts by Mabrey the injunction seeks to restrain.
(footnote: 48)  Mabrey argues that the injunction is impermissibly vague and general because it is not limited to information that is secret or not generally available to the public other than as a result of a disclosure by Mabrey and that the order is not limited, as was Mabrey’s nondisclosure agreement, to information disclosed by SandStream “prior to completion of the Proposed Transaction.”  We do not agree in either respect.  The terms of the order specifically refer only to “SandStream’s confidential and proprietary information . . . or trade secret information,” which necessarily excludes information not generally available to the public, and the order is limited in time to information obtained while Mabrey was a party to the nondisclosure agreement. 
 

The order is not only limited to SandStream’s confidential and proprietary or trade secret information but expressly excludes from its prohibitions any information that:  “(1) was in the Receiving Party’s possession without an obligation of confidentiality prior to receipt from the Providing Party; (2) is legally obtained by the Receiving Party from a third party without an obligation of confidentiality; (3) is specifically approved by distinctive written agreement of the providing Party; or (4) is required to be disclosed in order to provide with a judicial order or decree.”
(footnote: 49)  We hold that the temporary injunction order satisfies the requirements of Rule 683 by adequately defining the prohibited conduct concerning SandStream’s confidential and proprietary information at issue.
(footnote: 50)  We overrule Mabrey’s third issue.

IX.  CONCLUSION

Having overruled Mabrey’s issues, we affirm the order of the trial court granting SandStream the temporary injunction against him.

ANNE GARDNER

JUSTICE

PANEL A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

CAYCE, C.J. concurs without opinion in the result only.

DELIVERED:  December 11, 2003

FOOTNOTES
1:
On October 30, 2002, after entry of the temporary injunction, SandStream amended its original petition by adding causes of action for fraud, fraudulent inducement, fraudulent concealment, and civil conspiracy.  It is unnecessary to address whether we may consider the newly pleaded claims because we dispose of the appeal based upon SandStream’s originally pleaded causes of action.

2:
See
 
Tex. Civ. Prac. & Rem. Code Ann. 
§ 51.014(a)(4) (Vernon Supp. 2004) (“A person may appeal from an interlocutory order of a district court, county court at law, or county court that grants . . . a temporary injunction . . . as provided by Chapter 65.” );
 Tex. R. App. P
. 28.1.   On May 8, 2003, this court dismissed appeals filed by Napert, Easty, Wendt, Farquhar, Bindley, Sylvester, and Fiber.TV for want of jurisdiction.  
See Mabrey v. SandStream, Inc
., No. 2-02-351-CV, slip op. at 1-2, 2003 WL 21028322, at *1 (Tex. App.—Fort Worth May 8, 2003, no pet.) (mem. op.).  This court also dismissed the appeal of Pruneau.  
See id
.  Mabrey’s appeal remained pending, and we restyled the case 
Jim Mabrey v. SandStream, Inc
.  
See id
.

3:
Butnaru v. Ford Motor Co.
, 84 S.W.3d 198, 204 (Tex. 2002);
 Walling v. Metcalfe, 
863 S.W.2d 56, 57 (Tex. 1993);
 Davis v. Huey, 
571 S.W.2d 859, 862 (Tex. 1978).

4:
Walling
, 863 S.W.2d at 57; 
Int’l Fid. Ins. Co. v. Wise County Bail Bond Bd
., 83 S.W.3d 257, 260 (Tex. App.—Fort Worth 2002, no pet.).

5:
Butnaru
, 84 S.W.3d at 204 (citing 
Sun Oil Co. v. Whitaker
, 424 S.W.2d 216, 218 (Tex. 1968)); 
Walling
, 863 S.W.2d at 58.

6:
Universal Health Servs. v. Thompson, 
24 S.W.3d 570, 576 (Tex. App.— Austin 2000, no pet.); 
Birnbaum v. Alliance of Am. Insurers
, 994 S.W.2d 766, 783 (Tex. App.—Austin 1999, pet. denied) (noting appeal from temporary injunction may not be used to obtain advance ruling on merits), 
disapproved on other grounds, In re Bass, 
113 S.W.3d 735 (Tex. 2003).

7:
Butnaru, 
84 S.W.3d at 204; 
Gen. Fin. Servs
., 
Inc. v. Practice Place, Inc
., 897 S.W.2d 516, 519 (Tex. App.—Fort Worth 1995, no writ);
 Walling
, 863 S.W.2d at 58.

8:
Miller Paper Co. v. Roberts Paper Co.
, 901 S.W.2d 593, 598 (Tex. App.—Amarillo 1995, no writ).

9:
Int’l Fid. Ins. Co.
, 83 S.W.3d at 260.

10:
Davis
, 571 S.W.2d at 862; 
Int’l Fid. Ins. Co., 
83 S.W.3d at 260.

11:
Bell v. Tex. Workers Comp. Comm’n
, 102 S.W.3d 299, 302 (Tex. App.—Austin 2003, no pet.);
 Rugen v. Interactive Bus. Sys., Inc., 
864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ); 
Bertotti v. C. E. Shepherd Co.
, 752 S.W.2d 648, 651 (Tex. App.—Houston [14
th
 Dist.] 1988, no writ).

12:
Tom James of Dallas, Inc. v. Cobb
, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.) (citing 
Davis
, 571 S.W.2d at 862); 
Dresser Indus. v. ForScan Corp.
, 641 S.W.2d 311, 316 (Tex. App.—Houston [14
th
 Dist.] 1982, no writ).

13:
See generally, K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv., 
158 Tex. 594, 314 S.W.2d 782, 789 (1958); 
Hyde Corp. v. Huffines
, 158 Tex. 566, 314 S.W.2d 763, 769-70, 
cert. denied
, 358 U.S. 898 (1958) (adopting 
Restatement of Torts
 § 757 (1939)).  As noted in 
American Derringer Corp. v. Bond
, the sections dealing with trade secrets, as adopted in Texas, have been moved from the Restatement of Torts (Second) to the Restatement (Third) of Unfair Competition.  924 S.W.2d 773, 777 n.2 (Tex. App.—Waco 1996, no writ); 
Restatement (Third) of Unfair Competition
 §§ 39-45 (1995).

14:
Huffines
, 158 Tex. 566, 314 S.W.2d at 769-70.

15:
K & G Oil Tool & Serv. Co., 
158 Tex. 594, 314 S.W.2d at 789; 
see also
 
In re Bass, 
113 S.W.3d at 739 (“[A] trade secret is ‘any formula, pattern, device or compilation of information which is used in one’s business and presents an opportunity to obtain an advantage over competitors who do not know or use it.’”) (
quoting 
Computer Assoc. Int’l, Inc. v. Altai, Inc
., 918 S.W.2d 453, 455 (Tex. 1996)).

16:
Huffines
, 158 Tex. 566, 314 S.W.2d at 769-70.

17:
In re Bass, 
113 S.W.3d at 739 (quoting from 
Restatement of Torts
 § 757 cmt. B (1939), now moved to 
Restatement (Third) of Unfair Competition
 § 39 reporter’s n. cmt. d (1995)).

18:
K & G Oil Tool & Serv. Co.,
 158 Tex. 594, 314 S.W.2d at 789  (stating protection of trade secrets is well-recognized objective of equity and injunctive relief);
 Huffines
, 158 Tex. 566, 314 S.W.2d at 770 (observing that trade secrets are entitled to protection under the equitable jurisdiction of state courts);
 
Ctr. for Econ. Justice v. Am. Ins. Ass’n,
 39 S.W.3d 337, 343 (Tex. App.—Austin 2001, no pet.) (holding injunctive relief proper to prevent a party from gaining an unfair market advantage); 
Am. Derringer Corp.
, 924 S.W.2d at 778 (“The protection of a trade secret is a well-recognized objective of equity.”); 
Rugen
, 864 S.W.2d at 551(“Injunctive relief is recognized as a proper remedy to protect confidential information and trade secrets.”).

19:
Simplified Telesys, Inc. v. Live Oak
 
Telecom, L.L.C., 
68 S.W.3d 688, 692-93 (Tex. App.—Austin 2000 , pet. denied) (citing 
Huffines
, 158 Tex. 566, 314 S.W.2d at 770); 
see also Miller
 
Paper Co.
, 901 S.W.2d at 601 (upholding temporary injunction against former employee despite unenforceability of covenants not to compete or disclose in contract, where evidence supported inference that data taken was not within public domain and gave applicant an advantage over competitors); 
Rugen
, 864 S.W.2d at 552 (affirming temporary injunction although noncompetition agreement was unenforceable where parties stipulated information was intended to be kept secret and defendant would gain competitive advantage by use).

20:
Ctr. for Econ. Justice,
 39 S.W.3d at 343.

21:
Id.; T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc
., 965 S.W.2d 18, 21-22 (Tex. App.—Houston [1
st
 Dist.] 1998, no pet.) 
(holding plaintiff showed 
probability
 
of success
 proving that its confidential information was entitled to trade secret protection).

22:
Robbins and other executives of SandStream had taken out personal loans to help employees with financial hardship before the lay-off in May 2002. 

23:
There was conflicting evidence on whether Mabrey has now exercised a unilateral option not to continue funding Fiber.TV pursuant to his agreement with that company. 

24:
Nor does Mabrey argue, as did some of the former SandStream engineers at the temporary injunction hearing, that SandStream’s technology and business plan lost its trade secret status because rapid progress in the industry permitted Fiber.TV to develop and deploy the same technology through currently available off-the-shelf equipment and software independent of SandStream’s work.  Rather, in this appeal, Mabrey asserts several more specific arguments.

25:
Mabrey acknowledges that he is personally bound by the nondisclosure agreement with SandStream as a representative of his company, RBS, that the evidence at the temporary injunction hearing was undisputed that he invested $30,000 in Fiber.TV, and that he made a written agreement to provide Fiber.TV with an additional $500,000 in financing.  

26:
MCI Telecom. Corp. v. Tex. Utils. Elec. Co.
, 995 S.W.2d 647, 652 (Tex. 1999).

27:
See
 
Bell
, 102 S.W.3d at 302;
 Rugen, 
864 S.W.2d at 551; 
Bertotti
, 752 S.W.2d at 651.

28:
Huffines
, 158 Tex. 566, 314 S.W.2d at 769-70
; 
see also T-N-T Motorsports, Inc.
, 965 S.W.2d at 21-22.

29:
Miller Paper Co.
, 901 S.W.2d at 600 (holding obligation survives termination of the employment); 
Rugen
, 864 S.W.2d at 551; 
Gonzales v. Zamora
, 791 S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no writ).

30:
494 S.W.2d 204 (Tex. Civ. App.—Dallas 1973, writ ref’d n.r.e.)

31:
Id.
 at 208.

32:
Id.

33:
Id.

34:
Id.
 at 209.

35:
Id
. 

36:
Id
. at 212 (emphasis added).

37:
Tenet Health Ltd. v. Zamora
, 13 S.W.3d 464, 468 (Tex. App.—Corpus Christi 2000, pet. dism’d w.o.j.); 
Henderson v. KRTS, Inc
., 822 S.W.2d 769, 773 (Tex. App.—Houston [1
st
 Dist.] 1992, no writ).

38:
See Thompson
, 24 S.W.3d at 577; 
Tex. Indus. Gas v. Phoenix Metallurgical Corp
., 828 S.W.2d 529, 533 (Tex. App.—Houston [1
st
 Dist.] 1992, no writ).

39:
Butnaru
, 84 S.W.3d at 204; 
Tex. Indus. Gas
, 828 S.W.2d at 533.

40:
T-N-T Motorsports, Inc.
, 965 S.W.2d at 24.

41:
K & G Oil Tool & Serv
., 158 Tex. 594, 314 S.W.2d at 791 (holding “irreparable injury” shown by 
inability
 of plaintiff to determine how much lost sales and revenue would result from improper use of trade secret);
 T-N-T Motorsports, Inc., 
965 S.W.2d at 24 (holding where plaintiff testified loss of good will from improper use of trade secrets pending trial would be “immeasurable,” legal remedy was inadequate); 
Miller Paper Co., 
901 S.W.2d at 597, 602 (noting difficulty in calculating damages may be evidence that  injury is irreparable, and holding trial court free to credit testimony of plaintiff that “[w]e can kind of put of our hands on what is happening to us now, but we have no way of assessing the damage that this is going to cause”).

42:
See Garth v. Staktek Corp
., 876 S.W.2d 545, 549 (Tex. App.—Austin 1994, writ dism’d w.o.j.).

43:
Id
. (“Lost opportunity to create or gain control of a 
new market
 may result in unquantifiable losses for which there is no adequate remedy at law.”) (emphasis added).

44:
Birnbaum,
 994 S.W.2d at 782; 
see also Rugen
, 864 S.W.2d at 552 (holding that possession of confidential information and evidence that the defendant was in a position to use it justified an inference of probable irreparable injury). 

45:
See Elcor Chem. Corp
., 494 S.W.2d at 213 (affirming judgment enjoining use of trade secrets even though there was evidence that Elcor was in serious financial difficulty, had ceased to produce product, had let employees go, had sold some of its facilities, and was in reorganization under the federal bankruptcy laws).

46:
See id.; see, e.g.,
 
Garth, 
876 S.W.2d at 549 (holding injunctive relief proper where use of plaintiff’s confidential information would make it possible for defendant to enter market at same time as plaintiff, depriving plaintiff of competitive advantage); 
Gonzales
, 791 S.W.2d at 266 (holding evidence that use of confidential information made it “quick and easy” to enter the market supported temporary injunction); 
Bertotti,
 752 S.W.2d at 655 (holding evidence that use of trade secret information to contact plaintiff’s customers could result in unfair competitive advantage supported temporary injunction); 
ForScan Corp. v. Dresser Indus
., 789 S.W.2d 389, 395 (Tex. App.—Houston [14
th
 Dist.] 1990, writ denied) (holding injunctive relief supported by defendant’s testimony that he was in process of testing and attempting to market product).

47:
Walling
, 863 S.W.2d at 58 (citing 
Roland Mach. Co. v. Dresser Indus
.,  749 F.2d 380, 386 (7
th
 Cir. 1984)) (identifying situations in which damages alone do not provide an adequate remedy and a preliminary injunction is therefore appropriate relief).

48:
See
 
Tex. R. Civ. P. 
683.

49:
Moreover, the order specifically lists the acts prohibited by the defendants, as follows:

(1) making any commercial, business or personal use of SandStream Confidential Information;

(2) copying, transferring, duplicating, or reproducing the SandStream Confidential Information in any form;

(3) publishing or communicating, in any manner whatsoever, the SandStream Confidential Information to third parties;

(4) representing, either orally or in writing, to third parties that the SandStream Confidential Information is owned by or available for use by Defendants or any business associated with any Defendant;

(5) destroying, altering, concealing or modifying the SandStream Confidential Information, whether in electronic or hard copy form, pending further Order of this Court;

(6) destroying, altering, concealing or modifying any documents or records relating to the formation, ownership and operations of Fiber.TV, the employment or activity of Defendants and those in concert with them in forming and promoting Fiber.TV, and/or reflecting Defendants’ gathering, use and/or disclosure of SandStream Confidential Information; and

(7) directly or indirectly violating Defendants’ non-competition agreements with Plaintiff. 

50:
See
 
Tex. R. Civ. P. 
683; 
Rugen
, 864 S.W.2d at 553 (noting purpose of Rule 683 is to ensure parties are adequately informed of acts they are enjoined from committing and reasons for prohibition); 
see also Thompson
, 24 S.W.3d at 579 (noting requirement of specificity of temporary injunctions but also recognizing injunction “must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or . . . in somewhat different form calculated to circumvent the injunction as written”); 
cf. T-N-T Motorsports, Inc.
, 965 S.W.2d at 25-26 (modifying temporary injunction that prohibited use of “any information” relating to the plaintiff’s products and services to limit disclosure of “any Hennnessee Trade Secret information” relating to plaintiff’s products and work).