Sands v. Estate of Buys

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-297-CV

FRANK E. SANDS APPELLANT

V.

THE ESTATE OF  APPELLEE

JAMES CRAIG BUYS, 

DECEASED 

------------

FROM PROBATE COURT NO. 2 OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

In this accelerated appeal, Frank E. Sands appeals the trial court’s issuance of a temporary injunction for the Estate of James Craig Buys, Deceased.  In four issues, Sands complains that the trial court abused its discretion by granting the temporary injunction, the injunction is fatally defective in form and content, the Estate’s unclean hands preclude it from obtaining injunctive relief, and the temporary injunction is an unreasonable restraint of trade.  We will reverse and render.

II.  Background Facts and Procedural History

Sands is a certified public accountant who has practiced public accountancy in Plano, Texas for well over twenty years.  In February 2000, Sands sold his accounting practice to James C. Buys & Associates, P.C. (the Corporation).  The purchase agreement between Sands and the Corporation contained a covenant not to compete.  Immediately following the purchase of Sands’s practice, Buys moved the clients the Corporation had obtained from Sands from Plano to the Corporation’s Colleyville, Texas office.  The Corporation also acquired two other accounting practices in Plano.  In 2001, the Corporation retained Sands as an independent contractor to work on special projects assigned by Buys.  At that time, none of Sands’s former clients were being serviced out of the Corporation’s Plano office.  Instead, virtually all the clients in the Plano office had been obtained through the Corporation’s other acquisitions.  

In February 2002, Sands became a full-time employee of the Corporation, serving as manager of the Plano office.  Thereafter, about twenty of Sands’s former clients who had been transferred to the Colleyville office asked to be transferred back to the Plano office so that Sands could provide them accounting services.  Sands also actively marketed his services and generated more than twenty-five additional clients for the Corporation.  

While Sands was manager of the Plano office, the Corporation had several other employees and three independent contractors.  The independent contractors were practicing accountants who did not work exclusively for the Corporation.  

Buys died in June 2004.  Following Buys’s death, Sands continued to serve as manager of the Corporation’s Plano office at the request of the Estate’s attorney.  In addition, the Estate hired a business broker to negotiate the sale of the Corporation’s assets.  Sands made an offer of $50,000, which the broker believed was considerably less than the Plano office was worth.  Sands also notified Carol Buys-Michela, Buys’s widow, by letter of his intent to open up his own office regardless of whether the Estate accepted his purchase offer.  On August 17, Sands tendered his resignation from the Corporation effective August 31, 2004.  

Meanwhile, unbeknownst to Sands, the Estate negotiated with other CPAs to sell the assets of the Plano office.  One prospective purchaser was David Harvey, a CPA practicing in Richardson, Texas.  The Estate also obtained an ex parte temporary restraining order ordering Sands’s removal from the Plano office so that he could not access, use, or disclose any of the Corporation’s trade secrets or confidential or proprietary information.  

On August 20, 2004, Sands was removed from the Plano office pursuant to the temporary restraining order.  Sands took nothing with him except his personal time log.  On August 23, 2004, the Estate sent letters to all the Plano office’s clients advising them that Harvey was assuming the Corporation’s practice and that all future inquiries should be made to him at his Richardson office.  

The Estate then sued Sands for misappropriation of the Corporation‘s trade secrets and confidential information and for breach of the covenant not to compete contained in the February 2000 purchase agreement between Sands and the Corporation.  The Estate sought temporary and permanent injunctive relief.  After a hearing, the trial court ruled that the covenant not to compete was unreasonable as a matter of law and refused to grant injunctive relief on that basis.
(footnote: 1)  Based on the Estate’s misappropriation of trade secrets claim, however, the trial court entered a temporary injunction prohibiting Sands from “contacting, soliciting or accepting any business” from the Corporation’s clients with whom Sands had had any contact or for whom he had performed services during the time he worked for the Corporation as either an employee or an independent contractor.  This appeal followed.  

III.  Applicable Law

In his first issue, Sands contends that the trial court abused its discretion by entering the temporary injunction because, among other things, the Estate failed to establish a probable right to recovery on its misappropriation of trade secrets claim.  

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits.  
Butnaru v. Ford Motor Co.,
 84 S.W.3d 198, 204 (Tex. 2002).  A temporary injunction is an extraordinary remedy and does not issue as a matter of right.  
Id.; Walling v. Metcalfe,
 863 S.W.2d 56, 57 (Tex. 1993).  To obtain a temporary injunction, the applicant must plead and prove three specific elements:  (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.  
Butnaru,
 84 S.W.3d at 204.

Whether to grant or deny a temporary injunction is within the trial court's sound discretion.  
Id.
  A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion.  
Id.
  A trial court abuses its discretion if it grants a temporary injunction when the evidence fails to furnish any reasonable basis for concluding that the applicant has a probable right of recovery.  
Camp v. Shannon,
 162 Tex. 515, 348 S.W.2d 517, 519 (1961).  To show a probable right of recovery, the applicant need not establish that it will finally prevail in the litigation, but it must, at the very least, present some evidence that, under the applicable rules of law, tends to support its cause of action.  
In re Tex. Nat. Res. Conserv. Comm’n,
 85 S.W.3d 201, 204 (Tex. 2002); 
Camp,
 348 S.W.2d at 519.

A person is liable for disclosure or use of trade secrets if (1) he discovers the secret by improper means or (2) his disclosure or use, after properly acquiring the knowledge, constitutes a breach of confidence reposed in him by the other in disclosing the secret to him.  
Hyde Corp. v. Huffines,
 158 Tex. 566, 314 S.W.2d 763, 769, 
cert. denied,
 358 U.S. 898 (1958); 
Mabrey v. Sandstream, Inc.,
 124 S.W.3d 302, 310 (Tex. App.—Fort Worth 2003, no pet.).  As a general rule, in the absence of an enforceable agreement not to compete, an employer is not entitled to an injunction preventing a former employee from soliciting the employer’s clients.  
Rugen v. Interactive Bus. Sys., Inc.,
 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ).  A former employee is, however, precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment.  
Id.  Rugen,
 864 S.W.2d at 551.

A trade secret is “any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it.”  
In re Bass,
 113 S.W.3d 735, 739 (Tex. 2003).  It may include a list of customers.  
Hyde Corp.,
 314 S.W.2d at 776; 
Rugen,
 864 S.W.2d at 552.  But before information can be termed a “trade secret,” there must be a substantial element of secrecy.  
Rugen,
 864 S.W.2d at 552.  To determine whether a trade secret exists, courts apply a six-factor test:  (1) the extent to which the information is known outside of the employer’s business; (2) the extent to which it was known by employees and others involved in the business; (3) the extent of the measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  
Bass,
 113 S.W.3d at 739.

IV.  Probable Right of Recovery

When applied to this case, the 
Bass
 factors show that the Estate has not established a probability of success in proving, at trial on the merits, that its clients’ identities deserve trade secret protection.

A.  Extent to Which Information Was Known Outside Corporation’s       Business

The record shows that the identities of “a lot” of the Plano office’s clients were known outside the Corporation’s business because many of the clients knew each other.  In addition, Sands testified that the names of clients came up in casual conversation with other clients and on social occasions.   For instance, if asked at a social gathering whether he knew a particular person, Sands would say yes (if he did) and, if the person was client, would mention this fact.  Sands explained that he “never really gave . . . much thought” to this practice of his because he considered the clients’ identities public information.  Further, when prospective clients asked Sands for references, he gave them the names of the Corporation’s existing clients.  He and Buys had no agreement preventing this, nor was he aware of any ethical rules prohibiting it. 

B.  Extent to Which Clients’ Identities Were Known to Employees and         Others in the Business

The identities and addresses of the Plano office’s clients were completely available to Sands and all the other employees and independent contractors in the Plano office.  They were also accessible to employees from the Corporation’s Las Colinas office.  Buys and another employee routinely accessed information on the Plano office’s computers from the Las Colinas office.  Further, the independent contractors at the Plano office were practicing accountants who worked only part-time for the Corporation.  At least one of these individuals was free to maintain his own accounting practice while he worked for the Corporation.  Many of the Plano office’s clients were also known to Rick Lewis, the former owner of one of the accounting practices that Buys had acquired to start the Plano office.  There is no evidence that the Corporation had a confidentiality agreement or covenant not to compete with Lewis.

C.  Measures Taken by the Corporation to Guard the Secrecy of         Client Identities

The Corporation made few, if any, efforts to guard client identities.  For instance, in addition to giving its employees and independent contractors complete access to client information, the Corporation had no confidentiality policies and did not require its employees to sign confidentiality or nondisclosure agreements.  Further, Sands was never asked to sign such an agreement as an independent contractor or as manager of the Plano office. Although the covenant not to compete in the February 2000 sales agreement between Sands and the Corporation contained a confidentiality provision, that provision just covered 
Sands’s
 former clients, who comprised only about twenty of the over five hundred clients in the Plano office at the time of Buys’s death.
(footnote: 2) 

In addition, at Buys’s instruction the computers in the Plano office were left on twenty-four hours a day, and the information on them was accessible from the Corporation’s other offices.  Thus, anyone with a computer password could access the names and addresses of all the Plano office’s clients at any time.  Although each computer had its own password and firewall protection, the passwords were generally known to everyone in the Plano office.
(footnote: 3)   The Estate points out that, two months before he sold his own business to Buys in February 2000, Sands faxed a client list to Buys on which individual client names were not listed because he wanted to protect his clients’ confidentiality.  The Estate contends that Sands’s conduct is evidence that identities of the Corporation’s clients were confidential.  We disagree.  Even if relevant, evidence that Sands treated his clients’ identities as confidential while negotiating the sale of his business is not evidence that the Corporation treated its clients’ identities as confidential.  The only personal knowledge upon which Carol Buys-Michela based her belief that Buys had considered his clients’ identities confidential was Buys’s statement that “it was his practice and his clients.” 

D.  Value of Client Identities to Corporation and Its Competitors

There is some evidence that the clients’ identities, although not confidential, were valuable to the Corporation’s competitors.  For example, Sands himself used this information.  Before he was removed from the Plano office, Sands mentioned to one client by letter and as many as fifteen by telephone that he might be opening his own accounting practice.
(footnote: 4)  Sands also acknowledged that an accounting firm’s revenue would be negatively affected if its clients left. 

E.  Amount of Money or Effort Expended in Developing Information

The record shows that the Corporation expended little, if any, money, time, or other resources in developing or compiling a list of its clients.  Carol Buys-Michela testified that she had seen a customer list several times in the past and that she believed her attorney may have printed a partial list from the Plano office’s computers.  There is no evidence, however, that such a list was made available or even known to the Corporation’s employees or independent contractors. Sands testified that the Plano office had no client or customer list that he was aware of and that he did not take one with him when he left.
(footnote: 5)  Moreover, no client list was tendered at the temporary injunction hearing, even under seal.

F.  Ease or Difficulty With Which Information Could Be Properly Acquired      or Duplicated by Others

Finally, there is evidence that information regarding the clients’ identities could be properly acquired by others fairly easily.  For instance, after Sands was removed from the Plano office, six of the office’s clients sought him out and asked him to provide accounting services for them, even though Sands had not contacted them.  Further, there is evidence that many of the clients’ identities were generally known, at least to each other, because they knew each other.  Also, Sands testified that some of the Plano office’s clients were his personal friends.  

In addition, besides Sands, the Plano office had two full-time employees and three independent contractors who knew the identities of the Corporation’s clients.  There is no evidence that any of these individuals was subject to a confidentiality or nondisclosure agreement, a temporary restraining order, or a temporary injunction.
(footnote: 6)  Consequently, anyone desiring to obtain the clients’ identities could obtain that information from them.  The identities of many of the Plano office’s clients could also be obtained from Rick Lewis, one of the former owners of the accounting practices that Buys had acquired to start the Plano office.
(footnote: 7) 

Moreover, client identities could be acquired from David Harvey.  Buys-Michela testified that the Estate had reached an agreement with Harvey for him to maintain the Plano office until matters were resolved in the probate court.  The Corporation had sent letters to all the Plano office’s clients stating that Harvey would be assuming the Plano office’s practice.  The Estate and Harvey had not, however, agreed on a purchase price for the Plano office practice, and there is no evidence that the Corporation obtained a confidentiality or noncompete agreement from Harvey in the interim or in the event the sale fell through.  Therefore, Harvey could disclose the clients’ identities to others or, at the very least, compete with the Corporation himself.  Indeed, Harvey had attempted to discuss the Plano office’s clients with Sands, but Sands had given him no information because of the temporary restraining order. 

V.  Conclusion

In summary, the evidence presented at the temporary injunction hearing clearly shows that the identities of the Corporation’s clients, although of some value to the Corporation and its competitors, were not confidential.  Indeed, the only evidence of confidentiality presented at the hearing was the Corporation’s use of passwords and firewall protection on its computers—precautionary measures that are virtually universal on office and home computers alike.  The evidence further shows that many of the clients’ identities were known outside the Corporation’s business and could be easily and properly acquired by others. 

Because the record is virtually devoid of evidence that the identities of the Corporation’s clients are trade secrets, it provides no reasonable basis for concluding that those identities are entitled to trade secret protection until trial on the merits.  
See Bass,
 113 S.W.3d at 739; 
Camp,
 348 S.W.2d at 519; 
Mabrey,
 124 S.W.3d at 311.  Accordingly, we hold that the trial court abused its discretion by granting the temporary injunction in this case.  
See Camp,
 348 S.W.2d at 519.  We sustain Sands’s first issue,
(footnote: 8) reverse the temporary injunction, and render judgment denying the Estate’s request for a temporary injunction.

JOHN CAYCE

CHIEF JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DELIVERED: March 10, 2005

FOOTNOTES
1:
The Estate does not contend on appeal that the temporary injunction would also have been proper based on the covenant not to compete.

2:
As an aside, we note that Sands has not been enjoined from doing business with nearly fifty of his seventy former clients who continued their association with the Colleyville office rather than transferring back to the Plano office after Sands became manager there.  The trial court ruled that the covenant not to compete, which precluded Sands from doing business with these clients, was unenforceable, and the temporary injunction only enjoins Sands from doing business with clients he had serviced while working as an independent contractor or employee of the Corporation.  Sands never performed any work for the Corporation’s Colleyville office. 

3:
One or more of the passwords was also known to at least one employee in the Las Colinas office, who routinely accessed information on the Plano office’s computers. 

4:
Sands also testified that he’d had face-to-face conversations with six other clients, but he did not contact them.  Instead, when they became aware that he was no longer at the Plano office, they went to his home and asked if he would do their accounting work.  Sands had not contacted any of the Corporation’s clients since his removal from the Plano office. 

5:
Sands testified that he took nothing with him when he was removed from the Plano office except his personal time log.  Later, he was allowed to return to the office with his attorney to retrieve his personal signature stamp. 

6:
Sands testified that Nancy Sigley, the Plano office’s bookkeeper, was also removed from the office on the same day he was; however, Sigley is not mentioned in the temporary restraining order or temporary injunction.  

7:
Sands testified that, when he began working as the Plano office’s manager in 2002, about sixty-five percent of its clients were from the two accounting practices that the Corporation had acquired.  John Gilliad, the former owner of the second practice, worked as an independent contractor for the Corporation, although not exclusively.  He was also free to maintain his own accounting practice. 

8:
In light of our disposition of Sands’s first issue, we need not consider his remaining three issues.  
See
 
Tex. R. App. P.
 47.1 (only requiring court of appeals to address issues raised that are necessary to final disposition of appeal).