Charles Glen Hyde, Hyde-Way, Inc. and Aviation Utilities Services, Inc. v. Jimmy Ray and Trent Cragin

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-123-CV

CHARLES GLEN HYDE, HYDE-WAY, APPELLANTS

INC. AND AVIATION UTILITIES

SERVICES, INC.

V.

JIMMY RAY AND TRENT CRAGIN APPELLEES

------------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

This is an accelerated appeal from an order granting a temporary injunction compelling Appellants to restore, reconnect, and maintain a continued supply of water and water service to Appellees’ airport properties.  We hold that because the trial court did not have jurisdiction to order the temporary injunction, the temporary injunction is void.  Accordingly, we vacate the trial court’s order granting the injunction, dissolve the temporary injunction, and remand this case for proceedings consistent with this opinion.

I.  FACTUAL AND PROCEDURAL BACKGROUND

The Northwest Regional Airport is located near Roanoke, Texas, and is owned by Texas Air Classics (TAC).  Aviation Utilities Services, Inc. (AUSI) operates a water system at the airport.  Hyde-Way, Inc., was both entities’ predecessor in interest.  TAC, AUSI, and Hyde-Way are or were all operated by Charles Glen Hyde.

In 1991, Jimmy Ray purchased a hangar at the airport.  Deed restrictions prohibited the hangar from being used for residential purposes, but Ray constructed an apartment in the hangar anyway and occupied it as his permanent residence.  In 2002, Ray sold the apartment to Trent Cragin, who uses the property for commercial purposes.  Ray moved his residence to an apartment in a different hangar at the airport.

Since 1982, the water source to the airport’s property owners had been a well operated by Hyde-Way and then AUSI.  Ray did not use this well for drinking, but used it for all other purposes, including bathing and shaving. By letter dated August 15, 2001, Hyde advised water users, including Ray, that AUSI’s well had gone dry and that AUSI had drilled a new well.  He said that AUSI was requesting assistance from hangar owners in defraying the expenses of operating a new well.  Ray did not respond to this letter.

By letter dated December 5, 2002, Hyde advised water users, including Appellees Ray and Cragin, that AUSI’s water service was entirely within the town of Northlake’s authorized water service area.  Hyde informed the users that the Texas Commission on Environmental Quality (TCEQ) had warned AUSI, by letter dated September 19, 2001, that it was illegal for third parties, such as AUSI, to provide water service within another entity’s authorized service area and that new property owners must make arrangements with the only legally recognized entity, Northlake, for water services.
  The letter urged users to contact Northlake if they had recently transferred ownership.
 
 Hyde personally told Ray that he would be cutting off the water to Appellees’ hangars because they were new customers, each having recently transferred ownership.  However, Appellees refused to get water from Northlake because it was “not economically feasible” to do so.

On February 14, 2003, Appellees filed suit against Hyde and Hyde-Way. They requested a declaratory judgment establishing that Hyde and Hyde-Way were responsible for providing them water and that they be enjoined from terminating the water supply. 
 They also claimed that Hyde and Hyde-Way were liable for breach of contract.  Further, they requested a temporary restraining order and a temporary injunction restraining Hyde and Hyde-Way from terminating water services, and they sought damages if the injunctive relief did not dispose of all issues. 
 The trial court issued the temporary restraining order on the same day that Ray and Cragin filed suit.

On March 18, 2003, Hyde and Hyde-Way filed a plea to the jurisdiction contending that the action was within the jurisdiction of the town of Northlake and/or TCEQ and therefore beyond the subject matter of the district court. While the case was pending and after the temporary restraining order had lapsed, on April 12, 2003, Hyde, as president of AUSI, terminated the water supply and service to Appellees’ properties.
  Hyde reasoned that his actions were “in compliance with TCEQ” 
because in 2002 Cragin acquired ownership of Ray’s hangar and Ray acquired ownership of a new hangar; they were thus “new service connections” acquired after the September 19, 2001 letter, and consequently would require new service agreements from Northlake.

On April 25, 2003, Appellees filed an amended petition to add AUSI as a defendant and to add a claim for fraudulent or negligent misrepresentation. 
 Appellees also filed a response to the plea to the jurisdiction, claiming that no exclusive jurisdiction lies with any environmental or administrative entity. On April 30, 2003, the trial court denied Hyde and Hyde-Way’s March 18, 2003 plea to the jurisdiction and issued a temporary injunction mandating that Appellants Hyde, Hyde-Way, and AUSI restore, reconnect, and maintain a continued supply of water and water services.
  The basis for the temporary injunction was that Appellees were irreparably injured because there was no viable source of water for them pending the outcome of the suit.  
The temporary injunction also enjoined Appellees from using the water for human consumption
.

During the course of the case, Appellees again amended their petition to add TAC as a defendant in the suit.
  They also added  many causes of action, including claims of violation of deed restrictions, misappropriation, conversion, theft, fraud, tortious interference with existing contractual relations, tortious interference with prospective bus
iness relations, and breach of duty to provide an accounting. 
 
Appellants and TAC filed a counterclaim for violation of deed restrictions.

In May 2003, Appellants filed in this court an accelerated appeal from the temporary injunction and an emergency motion to stay the injunction pending the appeal.  On the same day, this court granted the stay motion, staying the temporary injunction.

On December 9, 2003, Appellees filed an emergency motion to modify or lift the stay, and on January 26, 2004, this court granted the motion.  Thus, the stay was lifted and the temporary injunction once again became effective.

Following the filing of the Appellants’ notice of appeal, on June 4, 2003, the Executive Director of TCEQ submitted a preliminary report and petition to TCEQ, alleging that AUSI had committed numerous violations of the Texas Administrative Code, Health and Safety Code, and Water Code, and suggesting that TCEQ assess penalties and require certain actions of AUSI
. 
 AUSI filed a plea to the jurisdiction of the TCEQ proceedings, alleging that TCEQ lacked jurisdiction because AUSI does not provide water for human consumption and is not a public water system subject to regulation by TCEQ.

As a result of the TCEQ proceedings, on 
December 9, 2003, this court abated the 
appeal pending the disposition of those proceedings.

On January 24, 2005, TCEQ’s Administrative Law Judge (ALJ) denied AUSI’s plea to the jurisdiction and
 ordered that the parties proceed to set a hearing on the merits
.  However, on 
June 8, 2005, the ALJ granted TCEQ ‘s motion to dismiss the case without prejudice due to the unavailability of necessary witnesses.  As a result, this court reinstated the appeal on the docket.

On appeal, Appellants argue that the trial court abused its discretion by ordering the temporary injunction because 1) the trial court lacked subject matter jurisdiction to grant such relief, 2) the temporary injunction potentially required Appellants to violate the law, 3) Appellants had no obligation to provide perpetual water supply to Appellees, and 4) Appellees failed to adduce the clear and convincing evidence required to support the mandatory relief granted by the temporary injunction.

II.  LEGAL ANALYSIS

A.  Standard of Review

Our review is strictly limited to whether the trial court abused its discretion in granting the temporary injunction.
(footnote: 1)  We may not substitute our judgment for that of the trial court by vacating or modifying an injunction simply because we would have decided otherwise.
(footnote: 2)  An abuse of discretion does not occur as long as there is some evidence to support the trial court’s decision.
(footnote: 3)  Furthermore, an abuse of discretion does not exist where the trial court bases its decision on conflicting evidence.
(footnote: 4)  As the reviewing court, we must draw all legitimate inferences from the evidence in a manner most favorable to the trial court’s order granting a temporary injunction and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion.
(footnote: 5)
B.  Subject Matter Jurisdiction

We first consider Appellants’ issue that the temporary injunction was improperly granted because the trial court lacked subject matter jurisdiction to grant such relief
.

Appellees claim that by arguing that the trial court has no subject matter jurisdiction, Appellants are attempting to conduct an impermissible interlocutory appeal of their plea to the jurisdiction, which was denied by the trial court. Texas Civil Practices and Remedies Code Section 51.014(a)(4) specifically allows an appeal from an interlocutory order granting or refusing a temporary injunction.
(footnote: 6) 
 That section also allows an appeal from an interlocutory order granting or denying a plea to the jurisdiction filed by a “governmental unit.”
(footnote: 7)  On the other hand, orders overruling pleas to the jurisdiction by private parties are generally interlocutory and unappealable until a final judgment has been rendered
.
(footnote: 8)  Appellants are appealing from the order granting the temporary injunction, not the plea to the jurisdiction.  Significantly, Appellants are not questioning the trial court’s subject matter jurisdiction to hear the entire case.  Rather, Appellants are only questioning the trial court’s jurisdiction to issue the injunction.  Thus, this issue is not an impermissible appeal of Appellants’ plea to the jurisdiction, and this court must decide whether the trial court had jurisdiction to issue the injunction.

Trial courts are courts of general jurisdiction.
(footnote: 9)  The Texas Constitution provides that a trial court’s jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by the Texas Constitution or other law on some other court, tribunal, or administrative body.
(footnote: 10) 
 
By statute, trial courts have the jurisdiction provided by Article V, Section 8 of the Texas Constitution, may hear and determine any cause that is cognizable by courts of law or equity, and may grant any relief that could be granted by either courts of law or equity.
(footnote: 11)  Courts of general jurisdiction presumably have subject matter jurisdiction unless a contrary showing is made.
(footnote: 12)  A similar presumption does not exist for an administrative agency, which may exercise only those powers that the law, in clear and express statutory language, confers upon it.
(footnote: 13)
 Under the exclusive jurisdiction doctrine, the legislature grants an administrative agency the sole authority to make an initial determination in a dispute.
(footnote: 14)  An agency has exclusive jurisdiction when a regulatory scheme indicates that the legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed.
(footnote: 15)  Because an agency’s power is derived from a statute, whether it has exclusive jurisdiction depends on statutory interpretation.
(footnote: 16)  If an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking judicial review of the agency’s action.
(footnote: 17)  Until the party does so, the trial court lacks subject matter jurisdiction of the claims within the agency’s exclusive jurisdiction.
(footnote: 18)
 Because determining whether an agency has exclusive jurisdiction requires statutory construction 
and raises jurisdictional issues, it is a question of law we review de novo
.
(footnote: 19) 
 As such, this court exercises its own judgment and the trial court’s discretion is afforded no deference.
(footnote: 20)  
Our objective when construing a statute is to determine and give effect to the legislature’s intent.
(footnote: 21)  To ascertain that intent, we look first to the statute’s plain language and give words their ordinary meaning.
(footnote: 22)  
We must view the statute’s terms in context and give them full effect.
(footnote: 23) 
 Further, we presume that the legislature acted with knowledge of the common law.
(footnote: 24)
 Section 13.042(e) of 
the Texas Water Code provides that the TCEQ has “exclusive original jurisdiction over water and sewer utility rates, operations and services not within the incorporated limits of a municipality exercising exclusive original jurisdiction over those rates, operations, and services.”
(footnote: 25)  Both rate and service are further defined only to include those pertaining to a “retail public utility,”
(footnote: 26) and the purpose of Chapter 13 is to regulate retail public utilities.
(footnote: 27)  Thus, Section 13.042(e) does not apply to Appellants unless they are “retail public utilities.”  
A “retail public utility” is defined as “any person, corporation, public utility, or [other entity] operating, maintaining, or controlling in this state facilities for providing 
potable 
water service or sewer service, or both,
 
for compensation.
”
(footnote: 28)  “Potable water” is not defined in Chapter 13 of the Water Code, but is defined by the Administrative Code as “water that is used for or intended to be used for human consumption or household use.”
(footnote: 29)  Thus, to determine whether Appellants are “retail public utilities,” we must determine whether Appellants 1) provide potable water service or sewer service, and 2) whether they do so for compensation.

Appellees argue that because the water is not potable, the first portion of the definition excludes Appellants.  However, 
looking to the statute’s plain language and 
viewing the terms in context
, we believe that the word “potable” only modifies “water service,” rather than “sewer service.”  Thus, because Ray admitted that he used and will use the water to flush his toilets, we believe that Appellants do in fact meet the first portion of the definition by providing 
sewer 
service, regardless of whether or not the water was potable.

Still, Appellants are not “retail public utilities” if they do not provide the service “for compensation.”  Appellants charged Appellees and other airport occupants monthly license fees for all of the airport subdivision services, including maintenance of the taxiways. 
 Appellees claim that some of these funds have been used towards expenses associated with the water production and distribution system. 
 However, at the hearing on the temporary injunction, Hyde contended that none of the money collected as license fees ever “ended up in” the water system.  Also, in a letter exhibit to the court and throughout the case, Appellants asserted that they were providing “free water” to the airport property owners.

Regardless, separate and apart from the monthly license fee payments, Ray has made two payments for his water supply.  At the temporary injunction hearing, Appellees offered and the trial court admitted into evidence a 1993 letter from Hyde, as president of AUSI, to all water users.  The letter, in relevant part, stated that:

free water to all airport hangars will be discontinued.  The water system has been sold to [AUSI].  If you signed a water agreement (see sample) upon purchase of your property, it will be honored provided the tap fee is paid on or before December 31, 1993, otherwise a $500.00 tap fee will be charged to all hangars.

Over the past eleven years Hyde-Way, Inc., has given away over $190,000 of free water, but . . . this service can no longer be provided free of charge.

Then, in 1995, Ray received another letter from Hyde stating that because there had been a major breakdown of the water system, AUSI was out of money.  The letter continued that:

if each large hangar would contribute $250.00. . .the repair reserve will be reinstated. . .There will be future water problems that will require funding.  If a voluntary contribution is not made, there will be no other alternative but to discontinue water service to that hangar.

Please make checks payable to [AUSI].

Ray testified that he paid $250.00 in1993 in response to the first letter and paid another $250.00 in 1995 in response to the second letter.  Thus,
 Ray—and perhaps others—have made payments to Appellants in exchange for their continued water services.  Although these payments were termed “voluntary,” occupants such as Ray seemed to have little choice—they could “contribute” to the water fund or have their service terminated.  Even if the water itself is now provided at no cost to those receiving it, as Appellants contend, the service has been provided for compensation.  Thus, because we find that the water service provided to Ray, and possibly other occupants of the airport, was for compensation, we hold that Appellants do qualify as “retail public utilities.”  Therefore, Section 13.042(e) governs if the issue is one that falls within TCEQ’s exclusive jurisdiction; that is, if the issue is water or utility rates, operations, or services.
(footnote: 30)
 BCY Water Supply Corp
. 
addressed a similar fact situation involving the continuation of water supply and Section 13.042(e).
(footnote: 31)  BCY was a corporate supplier of water that promised to supply water to Residential Investments’  proposed new subdivision.
(footnote: 32)  BCY later informed Residential Investments that BCY could not supply the water to the subdivision as initially indicated, and Residential Investments sued BCY, alleging that BCY had improperly denied water services to Residential Investments.
(footnote: 33)  
Subsequently, Residential Investments amended its pleadings, deleting its denial of service allegations and adding common law claims of negligent misrepresentation and promissory estoppel.
(footnote: 34)  BCY objected to the trial court’s jurisdiction based on Section 13.042.  The appellate court ultimately held that the trial court had jurisdiction over the common law causes of action.
(footnote: 35)  However, the appellate court specifically stated that its reason for finding that the trial court had jurisdiction was because Residential Investments had abandoned its denial of service cause of action when it amended its petition.
(footnote: 36)  The court interpreted the statutory language of Section 13.042 and denied that the TCEQ had exclusive jurisdirction of all claims “arising from” the provision.
(footnote: 37)  The court found that it had to presume that because the legislature chose not to include the words “arising from” in the provision, it intended to give the TCEQ jurisdiction over those matters 
directly related to
 water and utility rates, operations, and services, “such as was initially pleaded by Residential Investments in the instant case, but later abandoned.”
(footnote: 38)  Thus, the court signaled that if Residential Investments had continued to pursue the issue of whether BCY had improperly denied it water service rather than amending its petition to exclude it, this issue would have been under the exclusive jurisdiction of the TCEQ.

In their motion for temporary injunction, Appellees sought an injunction ordering Appellants to 
restore, reconnect, and maintain a continued supply of water and water service to Appellees’ airport properties
.  The temporary injunction was granted and compels these actions.  Thus, we hold that the temporary injunction orders actions directly related to water service and invades the exclusive jurisdiction of TCEQ under Section13.042(e).  Therefore, the trial court lacked jurisdiction to order the temporary injunction, and abused its discretion by doing so.  Because the trial court lacked jurisdiction to order it, the temporary injunction is void.  We do not address the trial court’s subject matter jurisdiction of the causes of action pending below,
 nor do we reach Appellants’ other issues.
(footnote: 39)
 Because we have held that the trial court lacked jurisdiction to issue the temporary injunction and that the temporary injunction is therefore void, we vacate the order granting the temporary injunction, dissolve the temporary injunction, and remand this case for proceedings consistent with this opinion.

LEE ANN DAUPHINOT

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED:  DECEMBER 8, 2005

FOOTNOTES
1:
See Butnaru
 
v. Ford Motor Co.
,
 
84 S.W.3d 198, 204 (Tex. 2002); 
Mabrey
 
v. SandStream
,
 Inc.
,
 
124 S.W.3d 302, 309 (Tex. App.—Fort Worth 2003, no pet.); 
Gen. Fin. Servs.
,
 Inc. v. Practice Place
,
 Inc.
, 897 S.W.2d 516, 519 (Tex. App.—Fort Worth 1995, no writ).

2:
Mabrey
, 124 S.W.3d at 309; 
Miller Paper Co. v. Roberts Paper Co.
, 901 S.W.2d 593, 598 (Tex. App.—Amarillo 1995, no writ); 
see also Butnaru
, 84 S.W.3d at 211.

3:
Butnaru
, 84 S.W.3d at 211; 
Mabrey
, 124 S.W.3d at 309.

4:
Mabrey
, 124 S.W.3d at 309.

5:
Id
.; 
Bell v. Tex. Workers Comp. Comm’n
, 102 S.W.3d 299, 302 (Tex. App.—Austin 2003, no pet.); 
Rugen v. Interactive Bus. Sys.
,
 Inc.
, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ); 
Bertotti v. C.E. Shepherd Co.
, 752 S.W.2d 648, 651 (Tex. App.—Houston [14th Dist.] 1988, no writ).

6:
Tex. Civ. Prac. & Rem. Code Ann. 
§
 51.014(a)(4) 
(Vernon Supp. 2005).

7:
Id. 
§
 51.014(a)(8).

8:
Tex. State Bd. of Exam’rs in Optometry v. Carp
, 343 S.W.2d 242, 243 (Tex. 1961).

9:
Subaru of Am.
, 
Inc. v. David McDavid Nissan
,
 Inc.
, 84 S.W.3d 212, 220 (Tex. 2002); 
Dubai Petroleum Co. v. Kazi
, 12 S.W.3d 71, 75 (Tex. 2000). 

10:
See
 
Tex. Const
. art. V, § 8; 
Subaru
, 84 S.W.3d at 220.

11:
See
 
Tex. Gov’t Code Ann
. §§ 24.007-.008 (Vernon 2004).

12: 
Subaru
, 84 S.W.3d at 220.

13:
Id.
 (citing 
Key W. Life Ins. Co. v. State Bd. of Ins.
, 350 S.W.2d 839, 848 (Tex. 1961)).

14:
See Cash Am. Int’l
,
 Inc. v. Bennett
, 35 S.W.3d 12, 15 (Tex. 2000).

15:
Subaru
, 84 S.W.3d at 221.

16:
Id.

17:
Bennett
, 35 S.W.3d at 15.

18:
Subaru
, 84 S.W.3d at 221.

19:
Id.
 at 222
; see also El Paso Natural Gas Co. v. Minco Oil & Gas
,
 Inc.
, 8 S.W.3d 309, 312 (Tex. 1999); 
Mayhew v. Town of Sunnyvale
, 964 S.W.2d 922, 928 (Tex. 1998).

20:
Quick v. City of Austin
, 7 S.W.3d 109, 116 (Tex. 1998).

21:
See Phillips v. Beaber
, 995 S.W.2d 655, 658 (Tex. 1999).

22:
Id.

23:
Id.

24:
Id.

25:
Tex. Water Code Ann.
 § 13.042(e) (Vernon 2000).

26:
Id.
 § 13.002(17), (21) (Vernon Supp. 2005).

27:
Id. § 
13.001(c) (Vernon
 2000).

28:
Id. 
§ 
13.002(19) (emphasis added).

29:
30 Tex. Admin Code
 § 291.3(30) (2005).

30:
See 
Tex. Water Code Ann
. § 13.042(e)
.

31:
BCY Water Supply Corp. v. Residential Inv.
,
 Inc.
,
 
170 S.W.3d 596, 601 (Tex. App.—Tyler 2005, pet. denied);
 
Lake Country Estates
,
 Inc. v. Toman
,
 
624 S.W.2d 677, 681 (Tex. App.—Fort Worth 1981, writ ref’d n.r.e.).

32:
BCY Water Supply
 Corp.
, 170 S.W.3d 
at 599.

33:
Id.

34:
Id.

35:
Id.
 at 601.

36:
Id.

37:
Id.
 at 600.

38:
Id.
 at 601.

39:
See 
Tex. R. App. P
. 47.1.