

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00085-CV

IN THE INTEREST OF J.G., D.G.,
AND C.G., CHILDREN

----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY

----------

## DISSENTING OPINION

----------

Because I do not believe that we can substitute our judgment for that of the visiting judge, I would conclude that the visiting judge did not abuse his discretion by denying the petition to adopt the children, and I would affirm the visiting judge's judgment.

On December 14, 2007, after a bench trial at which C.C. did not appear, a Denton County district court terminated her parental relationship with the children as

well as the birthfather's parental relationship with the children. The Denton County district court found that C.C. had (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being; (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (3) constructively abandoned the children, who had been in the temporary managing conservatorship of the Texas Department of Family and Protective Services (TDFPS) for not less than six months, and TDFPS had made reasonable efforts to return the children to her, she had not regularly visited or maintained significant contact with the children, and she had demonstrated an inability to provide them with a safe environment; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, who had been in the temporary managing conservatorship of TDFPS for not less than nine months as a result of their removal from the parents for abuse or neglect. The Denton County district court also found that termination of C.C.'s parental relationship with the children was in the children's best interest. There is no evidence in the record that C.C. appealed the termination of her parental relationship with the children.

Grandmother claimed that she began allowing C.C. to visit with the children when she saw that C.C. had "straighten[ed] her life up and [had] bec[o]me a responsible parent again." But the evidence also shows that the children had lived with C.C. and J.C. since July 2008, less than eight months after the termination of

2

C.C.'s parental rights.  In July 2008, TDFPS was still the children's managing conservator, not Grandparents.  And on January 30, 2009, the Denton County district court signed an agreed final order appointing Grandparents, not C.C., as the children's permanent managing conservators.

C.C. and J.C. married in August 2009, about thirteen months before they filed the petition for adoption.  They lived next door to Grandparents and saw them daily.  C.C. had not worked outside the home since 2001, long before her parental rights were terminated.

At the very short adoption trial on November 23, 2011, C.C. admitted on examination by the children's ad litem that drugs, including methamphetamine, were an issue when her parental rights were terminated.  She testified that to make sure she does not have a relapse, she "stay[s] at church.  [She does not] go around anyone. [She] stay[s] at home.  [Her] life is [her] children."  C.C. confirmed that she and J.C. both submitted to hair follicle tests sometime during the previous six months and that the results were negative.  The trial court heard no evidence about C.C.'s length of sobriety, whether she had or had not relapsed and if so, how many times and when, or whether J.C. had any criminal history or history of substance abuse.

The following exchange took place between the visiting judge and C.C. with no objection:

> THE COURT:  Who . . . brought this suit to terminate your parental rights?

3

[C.C.]: That—I would guess CPS. I'm not sure, sir. I was never—I never received the court papers to go to court whenever the termination happened, so I wasn't present whenever my rights were terminated.

THE COURT: Well, were you served with some papers?

[C.C.]: No, sir. I was not. My grandparents contacted me and told me that my rights were terminated.

THE COURT: Well, you had to have been served some papers for your rights to have been terminated.

[C.C.]: I never received—the only—the only court date—or the only court papers that I received, I went to, and that wasn't for termination.

THE COURT: What was that for?

[C.C.]: That was for them to tell me that I needed to take some classes and different things that were ordered from CPS.

THE COURT: Okay. So what happened that CPS got involved in your life?

[C.C.]: I was doing drugs.

THE COURT: Many people do drugs that don't have CPS involved in their lives. It has to impact the children before CPS gets involved.

[C.C.]: Well, someone had called because my children were not even—they—my children were with my grandmother and someone had called CPS. And I had my youngest son. And when they came in, they sent me straight to take a drug test, and I failed the drug test.

THE COURT: Okay. I don't have any more questions.

J.C.'s perfunctory testimony followed C.C.'s; no one else testified. At the end of testimony, the following dialogue occurred between the visiting judge and C.C. and J.C.'s trial counsel with no objection:

4

THE COURT: I didn't think your client was all as forthcoming as you told me she was going to be. I—I know people don't get their rights terminated unless they're served with papers. And she told me she wasn't served with papers. I need to see something out of that file because I'm not going to be satisfied with her answers about what went on with the children since she told me she wasn't even served with papers.

You know, I—I know that courts don't terminate people's rights that haven't even been served in a case. So I'm—I'm not able to grant the requested relief based only on her testimony about what went on in that case because I didn't find her to be all as forthcoming as you told me she was going to be.

So I—I don't mind taking this matter under advisement and getting you or [the children's ad litem] to get me some paperwork from that case like the termination decree *and the original petition with the affidavits attached to that original petition.* Or, if you want, you can bring it back and start over from scratch with [the sitting district judge]. *But I believe she's probably going to want to know the same information that I want to know. Because using drugs isn't what it takes to get CPS in your life. Using drugs and a problem with your children is what gets CPS in your life.* I've had way too many people come through this Court that have been using drugs and CPS wasn't involved in those cases at all. *So I need to know about the children and what went on with them back then.*

So whichever way is best for y'all. I'm sure I'll be working again for the Judge sometime in the not too far distant future. So if you want to gather those papers up and get another setting from the coordinator, we'll continue it to that date. And that's really all I need to see in order to make a ruling on the case.

[TRIAL COUNSEL]: Judge, I will be glad to get those documents for you. If I had known those would have been an issue I would have already gotten certified copies out of that file. I'm in and out of that court every week.

THE COURT: Yeah. Well, see, my issue in any case is the children.

[TRIAL COUNSEL]: Absolutely.

5

THE COURT:  Your issue is to represent your client.

[TRIAL COUNSEL]:  Yes, Your Honor.

THE COURT:  But I'm going to know what went on with the children beforehand before I let this lady who gave them up adopt them.

[TRIAL COUNSEL]:  I understand that.

THE COURT:  Okay.

[TRIAL COUNSEL]:  Will the court coordinator have your next date that you're working?

THE COURT:  If you'll get those papers and talk to her, she'll give you and me both a date.

[TRIAL COUNSEL]:  That will work great.

Would you like for the parents to be back for that?

THE COURT:  I really—I can't think of any testimony I need to ask anybody.  If you see something in the papers that you think might need to be cleared up, then it would probably be in your clients' best interest—

[TRIAL COUNSEL]:  Yes.

THE COURT:—to be here so they could clear it up.

[TRIAL COUNSEL]:  That will be fine, Judge.

THE COURT:  But if she's going to testify to me, she needs to clear it up.  I don't like this going around the bushes with people when we all know why we're here and what it's about, or at least everybody needs to know what I'm here about is the best interest of the children.

[TRIAL COUNSEL]:  Yes, sir.  I will also furnish our Ad Litem a copy of that set of paperwork that I get.  Will he need to be here also?

THE COURT:  I, knowing [the ad litem], would think he would want to be here.

6

[AD LITEM]:  Yes, Your Honor.  . . .  [Emphasis added.]

J.C. and C.C.'s trial counsel furnished the visiting judge with certified copies of the December 14, 2007 final order of termination and the January 30, 2009 agreed final order in suit affecting the parent-child relationship.  But despite the visiting judge's request and C.C. and J.C.'s trial counsel's assurances, C.C. and J.C. did not provide the petition for termination with accompanying affidavits to the visiting judge.

The visiting judge issued the following findings of fact after denying the petition for adoption:

1.     On or about December 14, 2007, [C.C.]'s parental rights were terminated to the children . . . [,] which suit was brought by Child Protective Service[s].  [Grandparents] were named Permanent Managing Conservators of the children.

2.     After December 14, 2007, the children were permitted by [Grandmother] to reside with [J.C. and C.C.], Petitioners.

3.     On September 22, 2010, Petitioners . . . filed a petition requesting adoption of [the children].

The visiting judge concluded that adoption of the children by J.C. and C.C. was not in the children's best interest.

Section 162.016(b) of the family code provides that "[i]f the court finds that the requirements for adoption have been met and the adoption is in the best interest of the child, the court shall grant the adoption."[1]  We review a trial court's decision on adoption for an abuse of discretion.[2]  A trial court abuses its discretion if the court

---

[1]Tex. Fam. Code Ann. § 162.016(b) (West 2008).

[2]*In re W.E.R.,* 669 S.W.2d 716, 716 (Tex. 1984).

7

acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.[3] But an appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances.[4] Further, an abuse of discretion does not occur when some evidence of substantive and probative character supports its decision.[5] In a bench trial, it is the trial judge "who has the opportunity to observe the appearance and demeanor of the witnesses, to evaluate the personality of the contending claimants, and to assess the needs of the child."[6]

Unlike the woman seeking to adopt in *D.D.T.*,[7] the case characterized by the majority as "quite similar" to the case before us, C.C. had already lost her parental rights to the children on multiple grounds, including endangerment and abandonment. The visiting judge did not make his decision based on C.C.'s marital status but on factors including her own actions that had already cost her her children. Before the trial judge were the 2007 order of termination providing the

---

[3]*Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

[4]*E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

[5]*Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

[6]*Hopper v. Brittain*, 612 S.W.2d 636, 638 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ).

[7]*In re D.D.T.*, No. 11-04-00022-CV, 2005 WL 283579, at *1–2 (Tex. App.—Eastland Jan. 31, 2005, no pet.) (mem. op.).

grounds for termination of C.C.'s rights to the children; the 2009 order transferring permanent managing conservatorship from TDFPS to Grandparents; the home study indicating that Grandmother had placed the children back with C.C. less than a year after C.C.'s rights were terminated and while TDFPS, not Grandparents, was still the children's managing conservator; and the brief testimony of C.C. and J.C.

C.C.'s testimony indicated that she had apparently abused drugs while her youngest child was in her physical custody, but she minimized the need for the removal. Absent from the record are documents showing more detailed information about why the children were removed from C.C., despite the visiting judge's specific request for this relevant evidence, his offer to continue the trial pending receipt of such evidence, and C.C. and J.C.'s trial counsel's assurances that he would provide the evidence. Just as the trial court may infer from a drug test refusal that a parent was using drugs in a parental termination case,[8] the visiting judge here could properly infer that C.C. and J.C.'s refusal to provide the evidence supporting the removal of the children from C.C. in 2007 indicated that such evidence would be damaging to their case.[9] The visiting judge was entitled to conclude, based on some evidence—the order of termination providing endangerment and abandonment as two of the grounds, his observations of C.C., the testimony she

---

[8]*See In re M.E.-M.N.,* 342 S.W.3d 254, 262 & n.7 (Tex. App.—Fort Worth 2011, pet. denied).

[9]*See Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993) (noting a fact may be proved by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts).

gave at trial, and her refusal to provide the affidavit supporting the children's removal—that the adoption was not in the children's best interest.[10]

Rather than second-guessing the visiting trial judge because he reached a different outcome than I might have reached had I been the factfinder, I would follow the law, overrule C.C. and J.C.'s three issues, and affirm the visiting judge's judgment. Because the majority does not, I respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

DELIVERED:  September 12, 2013

---

[10]*See Mabrey v. SandStream*, 124 S.W.3d 302, 315 (Tex. App.—Fort Worth 2003, no pet.) ("Viewing the evidence in the light most favorable to the trial court's order and indulging every reasonable inference in its favor, we hold that the trial court did not abuse its discretion in determining that SandStream had a probable right to relief . . . ."); *see also In re M.N.G.*, 147 S.W.3d 521, 530 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g).